NOT DESIGNATED FOR PUBLICATION

No. 126,183

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SAMUEL LEE DARTEZ II,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Riley District Court; GRANT D. BANNISTER, judge. Submitted without oral argument. Opinion filed August 9, 2024. Affirmed.

*Kristen B. Patty*, of Wichita, for appellant.

*David Lowden*, deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before GREEN, P.J., GARDNER and PICKERING, JJ.

PER CURIAM: Samuel Lee Dartez II appeals the district court's denial of his K.S.A. 60-1507 motion alleging ineffective assistance of counsel at his trial for attempted first-degree murder. Dartez argues that he did not intend to kill the victim, and because his attorneys advised him not to testify, the jury heard no evidence showing his lack of intent to kill. Dartez had an evidentiary hearing, and he argues that the district court wrongly denied his motion after holding that his attorneys' advice was not ineffective assistance. Nevertheless, the district court heard the testimony which Dartez would have presented to the jury, and the court determined that it was reasonable for his attorneys to

1

advise him not to testify. Because Dartez' argument necessarily involves asking this court to reweigh evidence, which this court cannot do, we affirm.

FACTS

Dartez, Stephanie Holden, and their two children lived together in Riley County, Kansas. In June 2014, Holden told Dartez that she wanted to end the relationship, but Holden and the children could not move out until July.

On July 3, 2014, Holden contacted Riley County Police to report an argument with Dartez that recurred throughout most of the day. Evidently, Dartez yelled at Holden and demanded to see her cellphone. He searched her to find if she had anything hidden on her. When Holden's phone made a sound, Dartez essentially tackled her to get the phone from her. She told police that he put one hand on her neck "and then took his other hand and attempted to put several fingers in her." At some point that day, Dartez also locked Holden out of their apartment.

On July 6, 2014, police received an anonymous call reporting that someone shouted "help" in the area near the apartment that Holden and Dartez shared. Police officers responded, and Holden told the officers that Dartez had initially stopped her from leaving the apartment to go to work. According to Holden, Dartez took her book bag and shoved her several times. Eventually, he shoved her out of the front door and locked it.

The next day, Dartez called the police to report that Holden had stolen a vehicle that the two evidently shared. Holden told the officers that she helped pay for the vehicle and was using it to remove her items from the shared apartment.

On July 27, 2014, after Holden had moved out of the apartment, Dartez picked Holden up from work. Instead of taking her to a friend's house—where she was staying—

2

Dartez took her back to the apartment they previously shared. According to Holden, Dartez was driving erratically and at one point, she got out of the vehicle while it was stopped at a stop sign. She later got back into the car. When they got closer to the apartment, two patrol vehicles were waiting and Dartez pushed Holden out of the vehicle.

The following day, Holden attempted to pick up the couple's children from Dartez' apartment. Dartez physically blocked Holden and said she could not take the children. He then prevented her from leaving. Holden described the month of July 2014 as "[h]ell" for her because of the incidents involving Dartez.

At an evidentiary hearing on this K.S.A. 60-1507 motion, Dartez testified that in the fall of 2014 he was enrolled in classes at Kansas State University and had a job at the campus library's IT help desk. His relationship with Holden had officially ended, and their children were in Colorado with Holden's father and stepmother. Due to the loss of the relationship, Dartez was hurt and depressed. He was taking Citalopram for depression and Adderall for ADHD. A report of forensic psychological evaluation from 2016 summarized his mental health records as follows:

> "On October 2, 2014, Mr. Dartez presented with feeling 'very down,' worsening concentration, and anxiety after he and his romantic partner separated and she moved to another residence while 'sharing the responsibility of the children.' He also indicated that 'she started running with people who are a bad influence and her activities were not appropriate for the children and he asked her to leave.' He indicated that trouble 'understanding her actions . . . has overshadowed work, school and every aspect of his life.' He was additionally diagnosed with 'depression with anxiety,' initiated on citalopram (antidepressant agent), and continued on Adderall. On October 10, 2014, Mr. Dartez presented for an appointment and reported that he felt 'more "relaxed."' His dosage of citalopram was increased."

Holden was the only person that Dartez knew in town, and he relied on her. At the K.S.A. 60-1507 evidentiary hearing, Dartez testified that he started carrying a knife sometime in October 2014, partly because he had an altercation with another man bigger than himself, and partly because he was thinking about hurting himself. Dartez testified that he felt that he was losing everything and did not know where to turn, adding that "everything was fallin' down and I just really didn't think that it was any reason for me to be around anymore."

On October 29, 2014, Aleta Hill, one of Holden's coworkers, contacted police at Holden's request about an incident involving Holden and Dartez during the day and night of October 28, 2014. During the day, Dartez repeatedly called Holden. That night, Dartez insisted on coming over to Holden's apartment. Holden indicated that she opened the door and asked Dartez to leave. He refused and yelled at Holden. Evidently, Holden agreed to let Dartez in to look at her cellphone. Once inside, Dartez cornered Holden in the kitchen and began smashing her head into the floor. He also choked her while she attempted to defend herself. Eventually, one of the children woke up, and Dartez left the apartment. The following day, it appears that Dartez attempted to break into Holden's apartment but was unsuccessful.

On November 13, 2014, Dartez was in class when he received a phone call from a detective advising that a warrant for his arrest would issue because of the October 28 incident. At the K.S.A. 60-1507 evidentiary hearing, Dartez testified that he was concerned with keeping his job if that happened. Dartez testified that he wanted to work everything out with Holden, explaining that he was not looking for a fresh start to the relationship but to find a way to "kindly coexist." Dartez stated he went to talk to Holden (1) because a lot of the issues between them were beginning to grow and become detrimental, (2) because he was thinking of hurting himself, and (3) because he wanted assurances from her that everything was not lost and that the kids needed him.

Later on the morning of November 13, after Holden showered and got dressed in her closet, Dartez was standing behind her. According to Dartez, at his K.S.A. 60-1507 hearing, he talked with Holden for a bit in her apartment. As Dartez tried to express his feelings, Holden acted like she did not want to listen and tried to walk away from him, taking the discussion outside. Dartez testified that he quickly lost control of himself, stating, "[I]t happened like fast." Dartez testified as follows:

"[E]very time I kept trying, kept trying to talk to her, it was—she would just like— wouldn't listen to me. She—I don't know if she wasn't understanding what I was conveying to her at the time, but I just kind of wanted her to let me know that this doesn't, you know, you don't have to, you know, do this, [kill yourself], you know, you will be okay."

At the K.S.A. 60-1507 evidentiary hearing Dartez testified that he never wanted to kill Holden. He stated that when he first went to meet her in her apartment, he did not have the intent to even injure her. He testified that he went over there wanting her to tell him that he did not have to kill himself.

According to Holden's trial testimony, Dartez was angry and followed her as she walked out of the apartment. Dartez told Holden that he wanted a ride, but she refused. As Holden walked away, Dartez followed her with his hands in his pockets. Holden was scared by Dartez' behavior and started to run.

Dartez caught up to Holden and forced her to the ground. Dartez began beating Holden with his fists and yelling at her. Karen Kemp, an eyewitness who happened to be driving near the scene, shouted at Dartez that she was calling the cops, but he continued beating Holden. Dartez then pulled out a knife and began stabbing at Holden while she attempted to defend herself with her hands. The knife broke. Holden was able to get up. Holden pounded on the passenger window of Kemp's car, spattering blood from her hand

5

onto the window. Kemp unlocked the door. Holden got into the car with blood pouring down her face and fled the scene with Kemp.

As a result of the attack, Holden suffered lacerations to her face. She also had lacerations and tendon damage in her hands. The treating physician testified that the wound he was mainly concerned about as far as a life-threatening injury was the potential puncture wound to her neck. Upon inspection, this wound turned out to be superficial. Holden remained in the hospital for two days for the injuries she suffered during the November 13 incident.

Hours after Dartez attacked Holden, the Kansas Highway Patrol (KHP) arrested Dartez. Dartez was depressed, feeling like his life was "definitely over." He barricaded himself in his car. A special response team attempted to negotiate with Dartez but ultimately had to use gas and physical force to get him out of the car. Following his arrest, Dartez was extremely quiet and seemed "defeated," which surprised one detective who expected him to be more agitated based on the nature of the offense and the stand-off with law enforcement. A detective who interviewed Dartez labeled him as suicidal and reported that Dartez planned to stab the first officer to approach him so that the other officers would have to shoot him. In another report, the same detective stated that Dartez was thinking about suicide by cutting his wrists in the car, that Dartez had some superficial cuts to his wrists, and that Dartez tried to suffocate himself with duct tape. When detectives recorded an interview with Dartez the next day, he spoke quietly enough that his statements are difficult to discern in the video.

At trial, attorneys Andy Vinduska and Blake Robinson represented Dartez. During the evidentiary hearing on this K.S.A. 60-1507 motion, Dartez testified that he did not have much of an opportunity to discuss his case and trial strategy with his lawyers and that he did not know how they planned to defend him. Dartez did not deny hurting

6

Holden, but he told his attorneys that he did not have the intent to kill her or even hurt her when he went to see her.

Before trial, Dartez told Vinduska about the medications he was on. Dartez also asked for a mental health evaluation, advising Vinduska that he had been evaluated twice before. Vinduska replied that another evaluation was not needed.

Dartez testified that Vinduska did not review the video interviews with him before trial. According to Dartez, Vinduska did not want to use the video interviews at trial because they would not help Dartez, since he admitted to cutting Holden. Vinduska told Dartez that he did not plan to call Dartez to the witness stand because his testimony would not help and because the State could then introduce the video interviews into evidence.

When discussing preparation for trial, Dartez explained what he would have told the jury if he had testified at trial. Dartez explained that he would have told the jury about the events of that day. He would have explained that he did not plan to kill Holden nor did he intend to kill Holden. And he would have explained what she did and said that caused him to lose his cool and attack her with the knife. But Dartez did not testify at trial.

At trial, when the State rested, the district court had an extended colloquy with Dartez about his choice to not testify. The district court told Dartez that he had no obligation to present evidence because the burden of proof was on the State, adding the following:

> "That includes, however, your choice, which is your choice alone, whether or not to
> testify. Because your attorneys can make any number of tactical and strategic choices
> along the way but among those that are left entirely to you would be the decision whether

or not you want to testify. Your attorneys can advise you on that. They can say I think that you ought to or I think you shouldn't. But in the end, that choice is entirely up to you. You understand that's the framework that we are operating in, correct?"

After Dartez confirmed, the district court asked whether he decided not to testify, and Dartez said yes. The district court asked if Dartez had a chance to ask questions or get advice from his attorneys about testifying, and Dartez said they spoke about it. The district court then asked if Dartez did not wish to testify, leaving it for the jury to decide whether the State had proven its charges, and Dartez said he did not wish to testify.

Thus, Dartez did not testify. Instead, his attorneys argued that the State failed to meet its burden of proof on the element of intent. That is, Vinduska stated the following in closing argument:

"We're not arguing to you that Sam wasn't there. We're arguing to you, what was his intent? Was his intent to kill her? . . . Was it the intent to kill her? It's not what happened to her that's on trial. It is whether he intended to kill her. What is his intent? In order to find him guilty of [p]remeditated [m]urder, you have to find there was a design and a plan to do it. You have to find that his intent was to kill her or was it. Was it his intent to harm her? Did he specifically want to kill her or did he want to disfigure her, to cause serious bodily harm? . . . Was his intent to kill her? This is again where I find a disconnect and would submit to you that it was not his intent to kill her because if he wanted to he would have. . . . The attack stopped because Samuel Dartez stopped attacking her. Why? Because his intent wasn't to kill her. He was enraged over conversations that they were having. He was enraged. Did he knowingly cause disfigurement to her? I submit to you he did. . . . I submit to you the evidence does not support his intent to kill her, as he did not, and if he wanted to kill her he had all the opportunity to. . . . I further submit to you the facts do not support that the attack was based upon an intent to kill her. It was based upon an intent to attack her and not the end result of her dying."

8

The jury convicted Dartez of attempted first-degree murder for the November 13 incident and battery for the October 28 incident. The district court sentenced Dartez to 272 months (22 years, 8 months) in prison. This court affirmed his convictions on direct appeal. *State v. Dartez*, No. 115,567, 2017 WL 3112819, at *1 (Kan. App. 2017) (unpublished opinion).

Dartez filed this K.S.A. 60-1507 motion, raising various claims of constitutional rights violations. One of the issues he raised was an ineffective assistance of counsel claim against his trial attorneys, Vinduska and Robinson. After reading appointed counsel's amended motion, the district court dismissed some of Dartez' claims and granted an evidentiary hearing on others.

On his claim of ineffective assistance of counsel, Dartez requested funding for an expert witness. Dartez sought to present testimony from a legal expert to show that his trial attorneys' performance was so outside of accepted practice that it could not be considered trial strategy. The district court denied the request.

Vinduska and Robinson testified during the evidentiary hearing. Vinduska was appointed 20 weeks before trial, and Robinson became cocounsel 18 weeks before trial. They agreed that there was no argument regarding Dartez' identity or Holden being injured, so they proceeded with the strategy of trying to diminish intent. Vinduska and Robinson testified that Dartez insisted on going forward with an "all or nothing" approach based on a lack of premeditated intent to kill Holden. Robinson stated that Dartez was charged with attempted premeditated murder, and he understood that he could introduce evidence to mitigate against specific intent. Vinduska acknowledged that specific intent was not required for aggravated battery.

Robinson testified that he and Vinduska planned to develop facts tending to show that Dartez did not have the intent to kill. Vinduska summarized those facts as follows:

9

"That he had the knife while he was inside of her apartment when the—it was just him and the victim. There was no other witnesses inside of the apartment with them at the time. He had kind of surprised her inside of her apartment based upon my recollection of the statements from her and if he had the intent to kill her that he had the opportunity at that time as compared to essentially following her out into the street in the middle of the day and then engaging in what then we considered to be an aggravated battery where he did in fact cut her.

     . . . .

"[G]iven the facts again that essentially negated him going into the apartment—her apartment and committing any type of violent act against her at that time, so those facts in support that he just—and he told us, like I didn't intend to kill her, and I certainly explained to him and well that's part of what the State has to prove that you did. That if they aren't able to prove the intent to kill, then the jury should in fact find you not guilty of the charged offense of premeditated—or attempted first degree murder.

     . . . .

"I believed that there was enough facts to support the lack of premeditation and that—and so ultimately we're dealing with premeditation, we're dealing with intent to kill. The facts that he did not even brandish a knife, commit any type of violent act in the—again when it was just her and him in the apartment negated premeditation. We didn't need additional testimony to support that. The lack of intent to kill was necessarily supported by what I would characterize as a superficial wound, which was the puncture wound. Because although it was a wound and it was close to her, I think, neck and maybe the collarbone, most of the wounds were to her hands. And so a lack of injury to what I would consider vital organ areas showed a lack of intent to kill but an intent to harm. So that's what we were working with in terms of giving the jury information on how they can find that he did not have these specific intents."

Vinduska and Robinson did not have Dartez testify about his state of mind but followed a different plan to get in evidence of what was going on in Dartez' mind at the time. Robinson explained as follows:

"I think there was—there was a way to get to his state of mind after the incident. There was—there was ways and we tried and I—I can't recall exactly how, but there was I think

10

testimony from either the victim or a detective along those lines. And of course, I just don't remember exactly how or what was asked."

There was no direct evidence at trial of why Dartez had a knife. Vinduska and Robinson explained that Dartez had a knife for his own personal safety. But they advised Dartez not to testify in his own defense. Robinson explained, "[W]e both admonished against it."

During the evidentiary hearing, Dartez acknowledged that people told him he was "soft-spoken," and the court reporter had to ask him to speak up twice. Vinduska testified that he was concerned with Dartez' demeanor and did not think the jury would like him. Vinduska and Robinson were concerned that Dartez would try to "mince words" about how he had harmed Holden and that his soft-spoken nature "comes off as almost manipulative" and would have played very poorly in front of a jury. Robinson explained as follows:

> "I think I had some concern about letting the jury hear his speech and his demeanor while he speaks, and I was, if I recall, just concerned that he would be off-putting to the jury I think for one thing. And just the general rule of thumb, you just don't want to give the State any additional information and run the risk of helping them with their case."

Vinduska conceded that sometimes juries like to have an explanation of an odd, bizarre thing that happened and some evidence that it was not premeditated. Vinduska testified that Dartez received word that a warrant would issue for his arrest for a prior incident, but Vinduska could not recall where Dartez was when he received the news or how Dartez felt about it. Vinduska described his knowledge of Dartez' mental state as follows:

> "I think most of it was probably gleaned from the statements after the fact, especially when talking with Detective Sanders that he was suicidal and that's kind of what

11

precipitated the extraction from KHP. That candidly Mr. Dartez was difficult to understand in person, he didn't talk a lot so communication was always very sparse. I'm sure that he probably did tell me and Mr. Robinson during the course of some consults that, yes, he was upset, he was potentially suicidal. Just in the overall context of whether that was prior to the act or after the act, I don't remember."

Vinduska did not recall Dartez ever telling him that he was suicidal before the crime, but Dartez did state that he became suicidal after the crime. Vinduska and Robinson were concerned that Dartez' suicidal thoughts and his behavior with the KHP "showed a level of understanding of what he did and almost a remorse for the act in and of itself and how that possibly goes to really his mental state at the time."

Robinson testified that he had seen the police interviews conducted the day after the knife attack. During the interview, Dartez told police that he was carrying a knife for himself, to try to cut his own throat and wrists. Dartez did not initially take responsibility for his actions, saying that the knife wounds were accidental and not the product of rage. The interviewing detective pointed out that Holden's injuries were not consistent with Dartez' explanation: that he had the knife in his hand when she tripped and he grabbed her lapels to stop her from falling.

After Dartez saw photographs of Holden's injuries, Dartez stated that the photos looked like someone tried to physically and intentionally cause harm to Holden. Dartez told the detective that he deserved to be charged with attempted first-degree murder. Vinduska and Robinson agreed that any statements Dartez made to law enforcement would not be admitted into evidence—unless he took the stand. When they advised Dartez not to testify, part of the consideration was his statements to police.

Vinduska did not recall ever asking Dartez what he was thinking during the incident. Vinduska explained why he would not ask that question as follows:

12

"[I]f he tells me something during the course of our communication and tells me that well this is what happened and then he doesn't—then he does desire to testify at trial and he goes up there and starts testifying to something that is different than what he has told me, I can work with anything he necessarily says on the stand, good or bad, as long as I know that it's been accurate and hasn't changed during the course of the attorney-client relationship, but if he starts telling me something differently that puts me in a very awkward situation during direct examination and now I know he's saying something different and how do I necessarily deal with that without the jury probably noticing that I am kind of wondering around. So that's the reason why I don't ask that question and I didn't ask that question of him."

Vinduska believed that there were facts suggesting that Dartez lacked the intent to kill and during trial the defense could try to argue that he lacked intent. Ultimately, Vinduska and Robinson agreed that because Dartez did not testify the jury never heard his version of what happened and his motivations.

Dartez' testimony was at least partly at odds with Vinduska and Robinson. That is, Dartez testified that he never knew the defense theory because his attorneys never discussed trial strategy with him, never discussed his police interviews with him, and simply told him a week before trial that he would not be testifying. On cross-examination, Dartez denied chasing Holden, denied stabbing her, denied trying to stab her, denied trying to hurt her, and argued whether "attack" was an appropriate word for the attack. Dartez, attorneys on both sides, and the district judge acknowledged that Dartez was soft-spoken.

After the evidentiary hearing, the district court denied Dartez' K.S.A. 60-1507 motion. Specifically, the district court held that Vinduska and Robinson had not provided Dartez with ineffective assistance. The district court found that Dartez chose not to testify, knowing that it was his choice alone. No evidence showed that counsel prevented Dartez from testifying. The district court added the following:

13

"It was clear from the 60-1507 evidentiary hearing that trial counsel agreed that Dartez would have a better chance by not testifying. However, as confirmed on the record, the decision was made by Dartez not to testify and it would have been improper for Vinduska to otherwise pressure Dartez to testify if he had disagreed.

"Trial counsel has the responsibility for making tactical and strategic decisions including the determination of which witnesses will testify, and what evidence to introduce. See *State v. Rivera*, 277 Kan. 109, 117, 83 P.3d 169 (2004); *Ferguson v. State*, 276 Kan. 428, 449, 78 P.3d 40 (2003). Even though experienced attorneys might disagree on the best tactics or strategy, deliberate decisions based on strategy may not establish ineffective assistance of counsel. *State v. Griffin*, 279 Kan. 634, 649, 112 P.3d 862 (2005). Based on the evidence at the 60-1507 hearing, there were plenty of reasons to support any recommendation not to testify.

"Having considered Vinduska's testimony regarding concerns about Dartez testifying at the criminal trial, as well as this Court observing Dartez, both substantively and stylistically, testifying at the 60-1507 hearing, it cannot be determined that there is a reasonable probability that, but for counsel performance, the result would have been different. Neither prong is established for this ineffective assistance of counsel claim."

Dartez timely appeals.

## ANALYSIS

*Was trial counsel ineffective for advising Dartez not to testify?*

Dartez argues that the district court erred by denying his K.S.A. 60-1507 motion. He asserts that his attorneys' advice not to testify was ineffective assistance of counsel. The State argues that Vinduska and Robinson did not provide ineffective assistance and the district court committed no error in denying the claim.

A district court has three options when handling a K.S.A. 60-1507 motion:

14

"'(1) The court may determine that the motion, files, and case records conclusively show the prisoner is entitled to no relief and deny the motion summarily; (2) the court may determine from the motion, files, and records that a potentially substantial issue exists, in which case a preliminary hearing may be held. If the court then determines there is no substantial issue, the court may deny the motion; or (3) the court may determine from the motion, files, records, or preliminary hearing that a substantial issue is presented requiring a full hearing.' [Citations omitted.]" *State v. Adams*, 311 Kan. 569, 577-78, 465 P.3d 176 (2020).

The standard of review depends upon which of these options a district court used. 311 Kan. at 578.

The Sixth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, guarantees a criminal defendant the right to effective assistance of counsel. *State v. Evans*, 315 Kan. 211, 218, 506 P.3d 260 (2022); *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014). When a defendant alleges ineffective assistance of counsel under K.S.A. 60-1507, the district court shall hold an evidentiary hearing on the motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." K.S.A. 2023 Supp. 60-1507(b); Supreme Court Rule 183(f), (g) (2024 Kan. S. Ct. R. at 241).

After a full evidentiary hearing on a K.S.A. 60-1507 motion, the district court must issue findings of fact and conclusions of law concerning all issues presented. Supreme Court Rule 183(j). An appellate court reviews the court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. Appellate review of the district court's ultimate conclusions of law is de novo. *Khalil-Alsalaami v. State*, 313 Kan. 472, 486, 486 P.3d 1216 (2021).

To be entitled to relief under K.S.A. 60-1507, the movant must establish by a preponderance of the evidence either: (1) "the judgment was rendered without jurisdiction"; (2) "the sentence imposed was not authorized by law or is otherwise open to collateral attack"; or (3) "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." K.S.A. 2023 Supp. 60-1507(b) (grounds for relief); see also Supreme Court Rule 183(g) (preponderance burden).

The procedural posture of a K.S.A. 60-1507 motion also affects the nature and scope of our review. When, as here, the district court conducts a full evidentiary hearing and makes findings of fact and conclusions of law in ruling on the motion, we apply the mixed standard of review generally applied in similar civil cases. *Khalil-Alsalaami*, 313 Kan. at 486.

When applying this standard, an appellate court must determine whether the district court's factual findings are supported by substantial competent evidence and whether those findings are sufficient to support the district court's conclusions of law. In the end, the district court's conclusions of law and its decision to grant or deny the K.S.A. 60-1507 motion are reviewed using a de novo standard of review. *Bellamy v. State*, 285 Kan. 346, 355, 172 P.3d 10 (2007).

"'Substantial competent evidence is that which possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can reasonably be resolved.' [Citation omitted.]" *State v. Sanders*, 310 Kan. 279, 294, 445 P.3d 1144 (2019). In reviewing the district court's factual findings for substantial competent evidence, appellate courts do not "'reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence.'" 310 Kan. at 294.

16

Courts assess claims of ineffective assistance of counsel under the two-prong test articulated in *Strickland v. Washington*, 466 U.S. 668, 690, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and adopted by our Supreme Court in *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985). A defendant must prove that "(1) counsel's performance was deficient and (2) counsel's deficient performance was sufficiently serious to prejudice the defense and deprive the defendant of a fair trial." *Edgar v. State*, 294 Kan. 828, Syl. ¶ 1, 283 P.3d 152 (2012); see *Khalil-Alsalaami*, 313 Kan. at 485-86.

To establish deficient performance under the first prong, Dartez must show that defense counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential. A fair assessment of counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight, reconstruct the circumstances surrounding the challenged conduct, and evaluate the conduct from counsel's perspective at the time. *Evans*, 315 Kan. at 218. A court considering a claim of ineffective assistance of counsel must strongly presume that defense counsel's conduct fell within the wide range of reasonable professional assistance; that is, the defendant must overcome the strong presumption that, under the circumstances, counsel's action might be considered sound trial strategy. *Khalil-Alsalaami*, 313 Kan. at 486.

Under the second prong, the defendant must show that defense counsel's deficient performance was prejudicial. To establish prejudice, the defendant must show with reasonable probability that the deficient performance affected the outcome of the proceedings, based on the totality of the evidence. A court hearing a claim of ineffective assistance of counsel must consider the totality of the evidence before the judge or jury. *Khalil-Alsalaami*, 313 Kan. at 486. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Evans*, 315 Kan. at 218.

17

An evidentiary hearing is not an opportunity for a movant to conduct a fishing expedition so that he or she "might catch a fact that could lead to something favorable." See *Stewart v. State*, 310 Kan. 39, 54, 444 P.3d 955 (2019).

Strategic choices made by counsel after a thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. Strategic choices made after an incomplete investigation can fall within the wide range of reasonable professional assistance if the decision to limit the investigation is supported by reasonable professional judgment. *State v. Hutto*, 313 Kan. 741, 750, 490 P.3d 43 (2021).

Dartez fails to show that the district court erred on either prong of ineffective assistance of counsel. On the first prong, he notes that misadvising a criminal defendant about testifying at trial can fall below an objective standard of reasonable representation. In support, he cites *State v. Rice*, 261 Kan. 567, 932 P.2d 981 (1997). Jerry D. Rice's attorney practiced mostly in Missouri and advised Rice not to testify believing that if Rice testified all his prior convictions could come into evidence, following the rule in Missouri and in federal court. 261 Kan. at 595. *Rice* does not help Dartez for two reasons. First, the attorney's deficient performance was harmless based on the defense theory that the victim was still alive, and the *Rice* court did not remand for a new trial. 261 Kan. at 607-08. Second, and more importantly, Rice's attorney did not have a correct understanding of one of the critical components of the decision of whether the accused should testify. And he failed to question local counsel about the issue. 261 Kan. at 607. In short, Rice's attorney did not understand Kansas law and failed in his duty of competence. Dartez does not point to any error of law made by his attorneys.

Dartez also supports his argument by citing to this court's opinion in *Aldrich v. State*, No. 109,326, 2014 WL 1707579 (Kan. App. 2014) (unpublished opinion). After being ejected from a bar, Douglas Aldrich struggled with Jerald Bird, the bar's unofficial bouncer, and stabbed Bird in the heart with a knife. A jury convicted Aldrich of second-

degree murder. The district court granted Aldrich's K.S.A. 60-1507 motion, concluding that his attorney's advice not to testify was objectively unreasonable. This court affirmed, holding that Aldrich needed to testify to establish his self-defense claim and any advice to the contrary was ineffective assistance of counsel. 2014 WL 1707579, at *13, 16. The *Aldrich* court quoted the following expert witness testimony:

> "'In this case in particular without the defendant's testimony there's very little evidence [to support a self-defense argument]. I mean there's absolutely no way they could meet the burden required under a self-defense test. The biggest issue in this case is we have the altercations or the conversations and arguments that were going on within the bar, and there were witnesses to those. . . . Once they leave the bar the only witness[es] to the events that occurred outside were Mr. Aldrich and the victim. . . . And whether this was a murder case or just an aggravated battery case we would still be—it would still be necessary for Mr. Aldrich to provide information[:] one, as to his reasonable belief, and, two, . . . he's the only one that can provide facts necessary to support that reasonable belief. Because there were no other witnesses to his altercation outside[,] he's the only one to provide it. Without his testimony, . . . there's nothing to meet the burden of self-defense.'" 2014 WL 1707579, at *10.

The expert testified that—because the only people who witnessed the event were Aldrich and the decedent—there was "'absolutely no way'" to present the affirmative defense of self-defense without Aldrich's testimony. 2014 WL 1707579, at *10. The expert witness added that the attorney's performance fell below professional norms by not advising Aldrich that his testimony would be the only evidence to support this defense. Dartez argues that his attorneys failed to appreciate the fact that there was no evidence to support the defense theory of lack of intent, making it like *Aldrich* where the defense failed to present evidence in support of self-defense.

Dartez' citation to *Aldrich* contains two flaws. First, self-defense is an affirmative defense to the State's charges whereas intent is an element which the State must prove. In other words, Aldrich needed to show evidence of self-defense at trial because, as a

19

practical matter, the State would present evidence tending to show that he did not act in self-defense. The *Aldrich* court noted that a claim of self-defense requires two showings. First, a subjective standard examines whether a defendant sincerely and honestly believed that force was necessary for self-defense. Second, an objective standard applies to the determination of whether that belief was reasonable. Aldrich could not meet his burden on the first prong without testifying about his sincere and honest belief that force— deadly force in his case—was necessary. 2014 WL 1707579, at *11. Importantly, self-defense as an affirmative defense operates independently of the State's burden. That is, even if the State proved every element of its case, including intent, the jury could acquit Aldrich based on his affirmative defense. Dartez is not similarly burdened here. Intent is an element that the State must prove, and Dartez bears no burden to present evidence undermining the State's case.

The second flaw related to Dartez' citation to *Aldrich* bears on the nature of the evidence. In *Aldrich*, the only witnesses to the decedent's final moments were Aldrich and the decedent. There was no possibility of drawing out information related to self-defense while cross-examining another witness. Aldrich was the only available witness.

Here, Holden testified about the attack she endured, and Kemp testified about witnessing that same attack. Further, the treating physician testified about the nature and extent of Holden's injuries. Dartez' counsel had an opportunity, apart from Dartez testifying, to show that the State's evidence of intent was lacking. The only similarity between this case and *Aldrich* is that attorneys advised both defendants not to testify. Apart from that fact, *Aldrich* is dissimilar to this case and provides no support for Dartez' contention that his counsel's performance fell below an objective standard of reasonableness. Dartez' argument has weak support legally.

Factually, Dartez' arguments would require this court to reweigh the evidence, which is beyond this court's scope of review. On the first prong, Vinduska and Robinson

20

testified that Dartez' testimony would have played poorly to the jury and they had concerns about the State's approach to cross-examination and impeachment evidence. The attorneys weighed the value of Dartez' testimony against the risk of introducing unfavorable evidence, such as the video of his interview with police. Some of the information involved in this weighing is available to this court; for example, the video of the police interview is part of the record on appeal. But the district court observed Dartez testify, which this court cannot do. The district court found that Vinduska and Robinson weighed all the options and, after observing Dartez testify, the district court found that the attorneys' assessment fell within an objective standard of reasonable performance. This court would need to reweigh the evidence to reverse the district court's decision, which falls outside the scope of review.

The district court's same observations played into its determination on the second prong of ineffective assistance of counsel—whether deficient performance prejudiced the defendant. The district court determined that Dartez' attorneys fashioned a reasonable trial strategy. The district court compared firsthand the value of Dartez' testimony against the risks associated with cross-examination and impeachment evidence. On the matter of Dartez' testimony, the State asked him at the K.S.A. 60-1507 evidentiary hearing if he had just described the event from his point of view. The State followed up by asking, "[I]s what you've talked to us today about, is that what you would have told the jury?" Dartez said yes. The district court observed the testimony which Dartez would have given the jury and found it reasonable that his attorneys advised him not to testify. The district court added the following:

> "Having considered Vinduska's testimony regarding concerns about Dartez testifying at the criminal trial, as well as this Court observing Dartez, both substantively and stylistically, testifying at the 60-1507 hearing, it cannot be determined that there is a reasonable probability that, but for counsel performance, the result would have been different."

21

On review by an appellate court, the court's duty is limited to deciding whether the district court's findings, viewed in the light most favorable to the prevailing party, are supported by substantial competent evidence. *Khalil-Alsalaami*, 313 Kan. at 491. With this understanding, it is appropriate to focus on our applicable standard of review. Viewed in the light most favorable to the prevailing party, the district court's findings, based on observing Dartez, both substantively and stylistically, testifying at the K.S.A. 60-1507 evidentiary hearing, are supported by substantial competent evidence. And the district court's findings, backed by substantial competent evidence, support its conclusion that Dartez' two trial attorneys were not deficient in advising him not to testify during his trial. Thus, it was objectively reasonable for Dartez' two trial attorneys to advise him not to testify. Because this court cannot reweigh the evidence, we affirm the district court's denial of Dartez' K.S.A. 60-1507 motion.

Affirmed.