MODIFIED OPINION[1]

IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 123,302

STATE OF KANSAS,
*Appellee*,

v.

BRANDON T. EVANS,
*Appellant*.

SYLLABUS BY THE COURT

1.

Claims alleging a violation of the Sixth Amendment right to effective assistance of counsel are analyzed under the well-established, two-part test established in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). First, the defendant must demonstrate trial counsel's performance was deficient. To establish deficiency, the defendant must demonstrate counsel's representation fell below an objective standard of reasonableness when considering the totality of the circumstances. When scrutinizing counsel's performance, courts must afford a high level of deference and make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. If the defendant establishes counsel's deficient performance, the court determines whether there is a reasonable probability that but for counsel's deficient

_____

[1]**REPORTER'S NOTE**: Opinion No. 123,302 was modified by the Supreme Court on March 18, 2022, in response to a joint motion for rehearing or modification.

1

performance, the outcome of the trial would have been different. A reasonable probability is one sufficient to undermine confidence in the trial's outcome.

2.

When a district court conducts an evidentiary hearing and makes findings of fact and conclusions of law in ruling on a claim of ineffective assistance of counsel, the appellate court reviews the district court's factual findings for substantial competent evidence and determines whether those findings support the district court's legal conclusions. Appellate courts do not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. When evaluating the district court's legal conclusions, the appellate court applies a de novo review standard.

Appeal from Sedgwick District Court; ERIC WILLIAMS, judge. Original opinion filed February 25, 2022. Modified opinion filed March 18, 2022. Affirmed.

*Kristen B. Patty*, of Wichita, argued the cause and was on the brief for appellant.

*Lance J. Gillett*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STANDRIDGE, J.:  In 2018, a jury convicted Brandon T. Evans of first-degree murder, aggravated battery, and criminal possession of a weapon. He filed a posttrial motion alleging his trial counsel was ineffective for several reasons. The district court denied Evans' motion after a hearing. On appeal, Evans argues his convictions should be reversed, his sentence should be vacated, and he should be granted a new trial and a new pretrial immunity hearing because his trial counsel was ineffective by (1) coercing Evans and Evans' witnesses to change their testimony about the events leading up to the murder

and (2) disregarding the firearm expert's testimony regarding the functionality of the victim's gun. But the record shows counsel did not disregard the expert's testimony or coerce Evans or his witnesses to change their testimony. We affirm.

FACTS

The State charged Evans with first-degree premeditated murder in the shooting death of Isaac J. Lewis, aggravated battery of A.G., and criminal possession of a weapon as a convicted felon. These charges stemmed from an incident that occurred at a private after-hours club in Wichita.

The night of the shooting, Evans, his brothers Justin Arrington and Kennell Evans, and Tanesha Thomas went to an after-hours club previously known as Daiquiris. Surveillance footage of the club's main entrance/exit shows the group arriving shortly after 1 a.m., getting patted down by club security, and being allowed to enter without issue. While there were few people at the club when the group arrived, it became packed and loud as the night progressed. Daiquiris had video cameras recording the club's main entrance/exit, but there were no video cameras inside the club.

The victim, Lewis, arrived at Daiquiris just a few minutes before 3 a.m. Surveillance footage of the club's entrance shows security screened Lewis and turned him away. He reappeared at the door at 3:06 a.m. Lewis handed the guard something—the same guard that earlier turned him away—and the guard allowed Lewis to enter. About five minutes later, Lewis left Daiquiris through the same door he entered. The video then shows Evans running up behind Lewis and shooting Lewis in the back twice: once in the neck and once in the lower left back as Lewis fell forward. The first bullet exited Lewis' neck and hit another customer, A.G., in her upper left arm, splintering her humerus. The second bullet traveled through Lewis' liver and lodged in his heart. After Lewis fell to the

3

ground, the video shows Evans firing another shot at Lewis before fleeing the scene on foot. That third shot hit the concrete next to Lewis, causing the bullet to fragment and leave minor abrasions on Lewis' abdomen.

Officer Joshua Rounkles responded to the shooting and helped another officer triage Lewis' wounds. As Officer Rounkles was treating Lewis, he discovered a loaded black Ruger LCP .380 caliber handgun on the ground underneath Lewis' buttocks. He also found two spent .40 caliber shell casings near Lewis. Officer Rounkles collected the gun and the casings and handed them to another nearby officer. Medical personnel pronounced Lewis dead at the scene. The coroner later determined the cause of Lewis' death was multiple gunshot wounds, and the manner of death was a homicide.

Meanwhile, Officer Aric St. Vrain chased Evans on foot after another customer identified him as the possible shooter and described what Evans was wearing. Officer Philip Berger was not on scene at the time of the shooting, but immediately after he arrived, he helped Officer St. Vrain chase Evans. Both officers saw that Evans had a gun in his hand as he was running away from them. After running a short distance away from the club, Evans disappeared behind a building but then reappeared to surrender himself to the officers. While arresting Evans, the officers noticed Evans no longer had a gun and began searching for it. Officer St. Vrain and another officer later climbed onto the roof of the building Evans disappeared behind and discovered a silver and black Ruger .40 caliber Smith & Wesson handgun.

Evans admitted to shooting Lewis but consistently maintained he did so in self-defense and in defense of his family members who were present at Daiquiris that night. Evans' trial counsel, Quentin Pittman, pursued both theories. A week before trial, Pittman filed a motion for immunity from prosecution based on these theories. The motion alleged Lewis threatened to immediately harm Evans and Evans' family members, Lewis

4

brandished a firearm while making these threats, Evans warned Lewis he would shoot Lewis if Lewis did not stop threatening them, Lewis said he would kill Evans and Evans' family, and Evans shot and killed Lewis in self-defense and in defense of his family. Evans claimed he should be immune from prosecution based on Kansas' stand-your-ground law because he sincerely believed deadly force was necessary to defend himself and his family and because a reasonable person in the same situation would have perceived deadly force was necessary.

The district court held a hearing on the motion. Evans took the stand and testified about his confrontation with Lewis inside Daiquiris on the night of the shooting—an exchange not caught on camera. Evans said he, his brothers, and Thomas arrived at the club around 1 a.m. A couple hours later, he was at the bar trying to buy a drink when Lewis approached him in "an aggressive manner." Lewis bumped into Evans a couple times at the bar to try and get Evans' attention. When Evans turned to face Lewis, Lewis pulled up his shirt to reveal a gun and told Evans he believed Evans had something to do with Lewis' cousin being shot. Lewis said he was going to kill Evans and Evans' family that night. Lewis then turned around and walked away.

Evans went to find his brothers. He told them they had to leave because Lewis had a gun. As he and his brothers were heading toward the main exit, Lewis confronted Evans again. Evans testified Lewis pulled out his gun, said he would kill Evans and "all [Evans'] friends," and then turned around and headed for the main exit, saying he was going to kill "that motherfucker outside." Evans explained that he texted his cousin earlier that night to come to Daiquiris to pick him up. Evans believed his cousin was outside in the parking lot waiting for him, and when Lewis said he was going to kill someone outside, Evans believed Lewis was talking about Evans' cousin. Evans testified he was not sure if Lewis still had the gun in his hand as he was leaving, but Evans quickly grabbed a gun off

5

another unknown customer, followed Lewis to the main exit, and shot Lewis from behind.

On cross-examination, Evans admitted several key points. First, he said he did not attempt to get help from any of the security guards inside the club after Lewis threatened him the first time. He admitted he did not know if his cousin was outside or not—he only had received a text message before the shooting that his cousin was on his way to Daiquiris. Evans acknowledged several people were around when Lewis pulled out his gun, but no one tried wrestling the gun away from Lewis, and no one ran to security to alert them Lewis had a gun. Evans conceded Lewis did not fire his gun at any point. Finally, Evans admitted he intended to kill Lewis when he shot Lewis.

Evans did not call any additional witnesses at the hearing. In denying Evans' motion for immunity from prosecution, the district court found:

> "Looking at all the facts that we have before us, the victim was leaving the club when he was shot. His back was turned to the defendant, the victim was shot directly two times, and fragments hit him from the third shot upon—after he was already on the ground.

> "Weighing all the credibility of the witnesses, we have—other than the defendant's statement himself, we have no corroborating evidence as to any threats that were made to the defendant or his family. Other than, again, the defendant's statements.

> "There were never any reported threats made to the bar staff or law enforcement pursuant to Detective [Michelle] Palmer[, the lead detective,] who reviewed all discovery and reports in this matter.

"Whether they were inside or outside security staff, no one reported that to the point that it made it in any reports from law enforcement at any time before or after these events.

"The Court makes a finding, based upon all this information, again, the victim was leaving the premises, had his back turned, did not appear to be making any threats at the time that this occurred. The Court makes a finding that there was no imminent threat to the defendant, or anyone else at the time that the victim was shot in the back of the head.

"Further, the victim and the defendant passed by where the money was taken, passed by where the bar was, there was security just steps—we don't know whether there was security inside to a point that he could have talked to someone but right outside that door there we know there was security, and he did not choose to tell anybody else or seek help at the time he acted and shot the victim at that point.

"With that being said, again, there was no imminent threat to the defendant by the victim at this point in time."

The case proceeded to jury trial the following week. Relevant to this appeal, the State called a firearms expert, Roger Michels, to examine both Lewis' and Evans' guns. Michels performed a function test on Lewis' gun. He testified:

"So as received, I had immense difficulty in actuating the slide, so the metal top portion, it was very difficult to pull back. Upon getting it to pull back, it would get stuck in that fully forward position and I would have to kind of hit the back of it to get it to close. There was also an issue with the trigger as received whereas when I pulled on the trigger, it was just going back. It wasn't engaging in anything. With that specific type of firearm, that trigger has a bar connected to it that actually connects to the hammer, which is what causes—which that hammer, when you pull the trigger, when you pull that trigger, that hammer is pulled rearwards and then is released forwards. When I was

7

pulling the trigger that was not happening because that bar was stuck in the lower position and it wasn't engaging. . . .

   . . . .

"We then continued and took the slide off of the firearm to try to diagnose the issue and upon—and all we could tell there's just a lot of dirt and material buildup. Upon putting that slide back on the firearm, it returned to functioning normal."

Michels also testified that he matched the .40 caliber shell casings found near Lewis' body to the gun Evans used.

During the defense's case in chief, Evans called his two brothers and a security guard from Daiquiris to testify on his behalf. Arrington testified he was at the bar with Evans and witnessed the altercation between Lewis and Evans. He overheard Lewis tell Evans that Evans was going to die that night just like "[Evans'] dead mother." Arrington said Evans blew it off. But then Arrington said he saw Lewis pull out a gun like he was going to point it at Evans, put the gun away, and then pull the gun out again. Arrington testified Lewis then walked away, and Evans went to get a security guard and look for their other brother. Arrington clarified he did not witness the shooting, and when he heard the gunshots, he ran out of the club. As he ran out the main exit, he saw Lewis lying on the floor outside the door.

Kennell Evans testified he was near the dance floor—approximately 7 to 8 feet away from the bar—when he saw the altercation between Evans and Lewis. He said he saw Lewis "rush[]" Evans with his firearm out. Kennell could see the firearm and he heard Lewis yell at Evans that he was going to kill Evans. Then Kennell saw Evans walk toward him. Kennell said Evans was "fearful" and "in a panic mode." Evans told Kennell they had to leave. When they headed for the main exit, Kennell said Lewis was blocking

the door so they could not leave. He said Lewis had the gun in his hand as he was walking out of Daiquiris.

Evans took the stand in his defense. His trial testimony was the same as his testimony from the immunity hearing with a couple of exceptions.

The jury returned a guilty verdict on all three counts. The district court set the matter for sentencing and ordered a presentence investigation report. Before sentencing, Evans filed a series of pro se motions alleging Pittman was ineffective as trial counsel. The district court agreed to consider two of the claims: (1) Pittman was deficient by coercing Evans and Evans' witnesses to change their stories and by withholding exculpatory evidence about Lewis' gun misfiring, and (2) Pittman was allegedly deficient by failing to request a competency hearing for Evans. The court appointed Steven Wagle to represent Evans on his motion. Wagle filed a separate motion alleging ineffective assistance of counsel and incorporating Evans' pro se motions.

The district court held an evidentiary hearing to consider Evans' claim of constitutionally ineffective legal representation by trial counsel. See *State v. Reed*, 302 Kan. 227, 235-36, 352 P.3d 530 (2015) (recognizing district court's subject matter jurisdiction to consider such posttrial claims of ineffective assistance of counsel).

After hearing the evidence, the court held Pittman did not coerce Evans and other witnesses to change their stories or withhold exculpatory evidence about Lewis' gun misfiring. The court then sentenced Evans to life without the possibility of parole for 618 months as to the first-degree murder charge. It further ordered Evans to serve an additional 171 consecutive months on the remaining counts.

This is Evans' direct appeal. We have authority to hear his appeal under K.S.A. 2020 Supp. 22-3601(b)(4) because Evans was convicted of first-degree murder, an off-grid person felony. We also have jurisdiction under K.S.A. 2020 Supp. 22-3601(b)(3) because he was sentenced to life in prison without parole for a minimum of 618 months.

ANALYSIS

Appellant challenges only the denial of his posttrial motion alleging ineffective assistance of his trial counsel. The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel. *State v. Betancourt*, 301 Kan. 282, 306, 342 P.3d 916 (2015). In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the United States Supreme Court established a two-part test to determine whether a defendant's right to effective assistance of counsel was violated. First, the defendant must demonstrate trial counsel's performance was deficient. 301 Kan. at 306. To establish deficiency, the defendant must demonstrate counsel's representation fell below an objective standard of reasonableness when considering the totality of the circumstances. When scrutinizing counsel's performance, courts must afford a high level of deference and make every effort to "'eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *State v. Cheatham*, 296 Kan. 417, 431-32, 292 P.3d 318 (2013) (quoting *Bledsoe v. State*, 283 Kan. 81, 90, 150 P.3d 868 [2007]).

If the defendant establishes counsel's deficient performance, the court determines whether there is a reasonable probability that but for counsel's deficient performance, the outcome of the trial would have been different. *Betancourt*, 301 Kan. at 306; *Cheatham*, 296 Kan. at 432. A reasonable probability is one sufficient to undermine confidence in the trial's outcome. 296 Kan. at 432.

10

We apply a bifurcated standard in reviewing the district court's decision on Evans' ineffective assistance of counsel claims following the evidentiary hearing. We review the district court's factual findings for substantial competent evidence and determine whether those findings support the district court's legal conclusions. "'Substantial competent evidence is that which possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can reasonably be resolved.'" *State v. Sanders*, 310 Kan. 279, 294, 445 P.3d 1144 (2019). Appellate courts do not "'reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence.'" 310 Kan. at 294. When evaluating the district court's legal conclusions, we apply a de novo review standard. *State v. Harris*, 310 Kan. 1026, 1045, 453 P.3d 1172 (2019); *Betancourt*, 301 Kan. at 306.

Evans raises two interrelated ineffective assistance of counsel claims:  (1) Pittman disregarded the firearm expert's testimony regarding the functionality of Lewis' gun; and (2) Pittman coerced Evans and Evans' witnesses to change their original stories that Lewis pointed the gun at Evans and pulled the trigger, but Lewis' gun misfired. The State maintains Evans failed to preserve his first claim. But because Evans raises the expert testimony issue as part of his coercion argument, we find it properly preserved.

1.  *Pittman did not coerce testimony*

We begin our discussion with Evans' coercion claim. At the evidentiary hearing, Evans first called Pittman to testify. Pittman explained when he first met Evans, Evans said that Lewis fired his gun twice inside the bar, causing Evans to chase after Lewis and shoot him. Based on the surveillance video evidence, Pittman said he knew this was not true. Pittman played the video footage for Evans, which showed Lewis did not fire first and no one inside the club reacted to gunfire until after Evans shot Lewis. Pittman told

11

Evans if he testified at trial that Lewis fired his gun twice inside the bar, the jury would not believe him because the video evidence contradicted this version of events. Once Pittman confronted Evans with this video footage, Evans changed his story: Lewis came in, brandished his gun to Evans, and threatened Evans. This was the version Evans testified to at the immunity hearing and at trial.

Pittman also spoke with Evans' brothers. One brother said Lewis fired shots at Evans in the bar. Pittman advised the brother his account did not align with Evans' version of events and contradicted the video evidence. Pittman said he was not coercing Evans or the witnesses to lie or change their stories—he was encouraging them to tell the truth based on what the evidence showed.

On cross-examination, Pittman testified he would have been reluctant to put Evans on the stand to testify Lewis fired his gun twice inside the bar when he knew Evans' original story contradicted the video footage. But Pittman said if Evans had insisted Lewis fired his gun twice inside the bar, Pittman would have continued down that road. Pittman noted, however, that Evans changed his story when Pittman presented him with the contrary video evidence.

On redirect examination, Pittman admitted Evans told him Lewis' gun misfired. But Pittman explained Evans told him this in conjunction with Evans' original story that Lewis actually fired the gun two times.

Evans also testified. He denied he ever told Pittman that Lewis actually fired the gun two times. Evans testified the only story he gave Pittman was that Lewis pulled the trigger, but the gun did not fire, which is why Lewis turned around to leave the club. Evans claims Pittman told him if he stuck to this story, the trial judge would not give him a self-defense instruction. Evans also testified his brothers signed affidavits stating

12

Pittman insisted they change their stories, but those affidavits were not in his possession due to an issue with the mail.

At the end of the hearing, the district court rejected Evans' claim that Pittman provided constitutionally deficient performance based on coercion:

"It's not coercion to tell the witnesses to tell the truth, and [the] Court makes that finding. The witnesse[s'] testimony or counsel's testimony today was when he met with those witnesses, that's what he told them. They need to tell the truth moving forward, and to which they did. Not changing the story because of the facts changing, they were changing the report to purport with the truth and what the evidence showed.

"So the Court finds that these witnesses were not coerced. They were simply told to tell the truth, to which they did. The Court makes a finding that this interaction with witnesses was not ineffective assistance of counsel."

Within its decision, the court implicitly found Pittman's testimony more credible than Evans' testimony. Appellate courts do not reweigh evidence, reassess witness credibility, or resolve conflicting evidence. *Sanders*, 310 Kan. at 294.

Our review of the transcript of the evidentiary hearing on Evans' motion alleging Pittman provided ineffective assistance establishes the district court's findings are supported by substantial competent evidence. Specifically, Pittman testified (1) Evans initially told Pittman that Lewis actually fired his gun twice and, at some point, the gun misfired; (2) Pittman presented the video to Evans, which showed Lewis did not fire first and no one inside the club reacted to gunfire until after Evans shot Lewis; (3) Pittman encouraged Evans to tell the truth; and (4) Evans changed his story and testified Lewis brandished his gun and threatened Evans, causing Evans to shoot him. Based on the factual finding, supported by substantial competent evidence, that Pittman did not coerce

13

testimony, we affirm the district court's legal conclusion that Pittman's performance was not deficient.

2. *Pittman did not disregard the firearm expert's testimony regarding non-functionality of the gun*

The State called a firearms expert, Roger Michels, to examine both Lewis' and Evans' guns. Michels testified the .380 gun recovered from Lewis' body did not function when Michels initially examined it. Michels explained there were two problems with the .380 gun: (1) the trigger did not engage with the hammer, so it could not fire; and (2) the gun was dirty, causing the slide to stick in the open position when pulled back. After cleaning and reassembling the firearm, Michels said it functioned normally.

Evans claims Pittman provided deficient performance by disregarding Michels' testimony regarding the non-functionality of Lewis' gun. But Evans concedes Pittman specifically addressed Michels' testimony during closing argument:

"[Defense counsel:] My client is confronted by Lewis. Lewis has a gun. Lewis has shown him the gun. This is seen by a security guard employed at the club. Lewis escalates the situation. Lewis isn't retreating. Lewis isn't running away. Lewis is going to the parking lot to make good on his threat. He's going to shoot [] Quinn and then he's going to get my client and the rest of his family. Before Lewis can do that, does Brandon shoot him? Of course he does, and under the circumstances, that shooting was justified. Because the harm, the danger, and the gun were all real and they were imminent and Brandon's actions were necessary.

"*But we also heard this, right, Isaac didn't get a shot off. He could have taken him out right then and there. No, he couldn't; right? I don't know if you were paying attention to Mr. Michels titillating information that he gave us earlier this morning, but remember this, unbeknownst to Brandon, what? Isaac couldn't get a shot off; right? His*

14

*gun wouldn't fire. Roger Michels had to take it apart, had to take the slide off, and put it back on. After he took care of that, it would shoot. It wouldn't shoot before. So the fact that Isaac Lewis didn't fire at my client, who knows, maybe he tried to and that gun wasn't fireable. You heard it from their witness, their expert from the KBI. It wouldn't shoot.*" (Emphasis added.)

Substantial competent evidence supports a finding that Pittman did not disregard Michels' testimony that the .380 gun was non-functional when first examined; rather, Pittman specifically presented Michels' testimony to the jury without overemphasizing it in a manner detrimental to the theories of self-defense. We find no deficiency in Pittman's performance on this claim.

Affirmed.