NOT DESIGNATED FOR PUBLICATION

No.126,439

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JEREMY DAVID LEVY JR.,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY E. GOERING, judge Submitted without oral argument. Opinion filed September 6, 2024. Affirmed.

*Kristen B. Patty*, of Wichita, for appellant.

*Matt J. Maloney,* assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.


Before HURST, P.J., GREEN and ATCHESON, JJ.


HURST, J.:  A jury convicted Jeremy D. Levy Jr. of first-degree murder for the shooting death of Erick Vazquez, a person unknown to Levy, who was caught in the crossfire of a shootout between Levy and members of a rival group. Levy filed a pro se K.S.A. 60-1507 motion arguing that he was entitled to a new trial resulting from the ineffective assistance of his trial counsel. On appeal, Levy claims his trial counsel was deficient for 'promising' the jury he would testify and failing to present a theory of self-defense based on newly available evidence. Not only does Levy fail to show that his trial counsel was deficient for the reasons asserted on appeal—he fails to show how the

1

alleged deficiencies prejudiced the outcome of his trial. In fact, Levy's 60-1507 motion and appeal contradict a self-defense claim.

Levy's 60-1507 motion, along with the records and files, conclusively demonstrate that Levy is not entitled to relief on his claim that his trial counsel was ineffective for statements implying Levy would testify or failing to present a theory of self-defense even if all of Levy's allegedly new facts are true. The district court did not err when it summarily denied Levy's 60-1507 motion.

FACTUAL AND PROCEDURAL BACKGROUND

In June 2018, a jury convicted Jeremy David Levy Jr. of murder in the first degree. The Kansas Supreme Court affirmed his conviction and recounted the facts as follows:

"Erick Vazquez was shot to death as he sat inside his gray Nissan truck in the parking lot of a strip mall in Wichita on June 17, 2017. He was an innocent victim caught in cross-fire between two rival gangs. Jeremy D. Levy was a member of the Folk Gangster Disciples, while three individuals—including KeAndre Summers—were members of the Piru Blood gang. Levy had been getting a haircut at the barbershop in the strip mall when he saw the three Piru Blood members sitting on the tailgate of a white Ford F-150 in the parking lot.

"According to the barber, Levy became agitated and said that he did not 'get along' with the group outside. After the haircut, Levy left the barbershop and the barber saw him turn right toward some shops further down the strip mall. At that point, the barber saw Summers pull a gun and heard shots ring out from the direction Levy had gone. Summers returned fire, and the three Piru Blood members crouched down using the F-150 as cover. A gun battle ensued until the three Piru Bloods were able to drive off in a white car. After the shooting, the barber went outside to render aid but did not see Levy.

"Once police arrived, they found a parked Nissan truck with its engine revving at a high rpm and Vazquez unresponsive in the driver's seat with his foot on the gas. He was declared dead on the scene. Investigators recovered shell casings near the F-150's driver's side door, in the bed, and on the truck bed toolbox. Testing determined two firearms were used in the shooting. The State's theory at trial was that Levy and Summers engaged in a mutual gun battle and Vazquez was an unfortunate bystander. The State relied on eyewitness testimony to establish that both Levy and Summers participated in the gun fight. Levy and Summers were charged in separate criminal cases.

"An officer with significant experience with Wichita gangs—Detective Sage Hemmert—testified generally about Wichita gangs and to the rivalries between the Bloods and the Gangster Disciples, or 'GD's.' According to Detective Hemmert, this feud began in 2008. Detective Hemmert confirmed that Summers and the others with him were 'Piru Blood' gang members and identified Levy as a Gangster Disciple. He explained a music video posted to social media intensified tensions. The video, which featured Summers, was filmed by a Piru Blood and included lyrics about 'shooting people in the face and the head' and included 'several lyrics about sending people to the cemetery'—directed at the GDs.

"The State arrested Levy on July 8, 2017, and charged him with felony murder with the underlying felony of criminal discharge of a firearm at an occupied vehicle. At trial, Levy focused on the State's lack of direct forensic evidence tying him to the shooting and attacked Detective Hemmert's gang theory as motivation for the shooting. A jury convicted Levy of first-degree felony murder and Levy received a hard 25 sentence." *State v. Levy*, 313 Kan. 232, 233-34, 485 P.3d 605 (2021).

Levy filed his K.S.A. 60-1507 motion on December 9, 2021, alleging that his trial counsel was ineffective for obtaining continuances without Levy's consent and failing to "legitimately investigate [and] present viable PTSD-Self Defense[,] Use Expert Witnesses [and] Competent Investigator(s)[,] [and] Procure/preserve exculpatory facts [and] evidence." Levy argued that his right to present a complete defense was "egregiously abandoned by appointed counsels" and his trial counsel's deficient conduct irreparably prejudiced his legal rights because his trial counsel failed to "properly

3

investigate, prepare and present a self-defense theory." Levy alleged that his trial counsel failed to investigate and show that the group shooting at Levy when he left the barbershop was the same group that shot him three weeks prior. Further, Levy argued his trial counsel was ineffective for not having Levy evaluated by an expert and did not have a self-defense expert testify about Levy's PTSD.

The district court denied Levy's 60-1507 motion without a hearing or appointing him counsel. The district court explained that Levy failed to show how further investigation would have been beneficial to his defense, and that there was evidence presented at trial to tie the previous shooting to the one at issue here. The district court also explained that Levy failed to show that he suffered from PTSD or that he would have been diagnosed as such. Finally, the court noted that a theory of self-defense was inconsistent with the defense of actual innocence presented at trial and would have required Levy to admit he fired a weapon. Even in his 60-1507 motion, Levy maintained that he did not participate in the shooting.

The court denied Levy's motion to alter or amend the district court's judgment. Levy was granted the right to appeal out of time.

DISCUSSION

While Levy's 60-1507 motion included several claims of ineffective assistance of counsel, on appeal he asserts just one of those theories. By failing to raise those other claims of ineffective assistance of counsel on appeal, Levy has abandoned those arguments. See e.g., *Shelton-Jenkins v. State*, 317 Kan. 141, 143-44, 526 P.3d 1056 (2023) (finding the defendant abandoned claims in the 60-1507 motion by raising them only incidentally on appeal). On appeal, Levy claims first that his counsel was ineffective for failing to present a self-defense theory after implying such in the opening statement

4

and promising that Levy would testify. He also includes new facts that, if true, he claims entitle him to an evidentiary hearing.

When a defendant requests relief for ineffective assistance of counsel through a 60-1507 motion, the district court has three options for handling the motion. The district court may (1) conclusively determine the petitioner is not entitled to relief, after review of the record, and summarily dismiss the motion; (2) determine that a full evidentiary hearing is required because the record demonstrates the petitioner presented a substantial issue; or (3) determine the petitioner presented a potentially substantial issue and hold a preliminary hearing to determine if the issues presented are substantial. "'In the event the court determines that the issue or issues are not substantial, the court may move to a final decision without the presence of the petitioner. If the issue or issues are substantial, involving events in which the petitioner participated, the court must proceed with a hearing involving the presence of the petitioner.'" *Mundy v. State*, 307 Kan. 280, 301, 408 P.3d 965 (2018) (quoting *Lujan v. State*, 270 Kan. 163, 170-71, 14 P.3d 424 [2000]). The district court here took option one and summarily dismissed Levy's ineffective assistance of counsel claims without any hearing or appointing counsel.

The option the district court takes then dictates this court's approach on appeal. When the district court summarily denies a 60-1507 motion without any hearing, this court reviews the motion, files, and records of the case de novo to determine whether they conclusively establish the movant was not entitled to relief. *Noyce v. State*, 310 Kan. 394, 398, 447 P.3d 355 (2019). The Sixth Amendment to the United States Constitution guarantees criminal defendants facing prison sentences the right to effective assistance of counsel. *State v. Evans*, 315 Kan. 211, 217, 506 P.3d 260 (2022). This court reviews a defendant's claims of ineffective assistance of trial counsel—like the one Levy asserts— using a two-prong test commonly referred to as the *Strickland* test. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985).

To demonstrate ineffective assistance of counsel, the defendant must first show that their counsel's performance was deficient, and then the defendant must show that deficiency resulted in prejudice. To establish the first step—deficiency of counsel's representation—the defendant must show that their counsel's representation fell below an objective standard of reasonableness under the totality of the circumstances. In evaluating the performance, this court "must afford a high level of deference and make every effort to 'eliminate the distorting effects of hindsight . . . .'" *Evans*, 315 Kan. at 218. Defendants must overcome this strong presumption of professional conduct to show that their counsel's conduct fell below the wide range of reasonable professional assistance and what might be considered sound trial strategy. *Khalil-Alsalaami v. State*, 313 Kan. 472, 486, 486 P.3d 1216 (2021).

If the defendant meets this first prong and successfully demonstrates deficient performance, this court must then determine prejudice resulted from that deficiency. In doing so, the court assesses "whether there is a reasonable probability that but for counsel's deficient performance, the outcome of the trial would have been different." *Evans*, 315 Kan. at 218. A reasonable probability is a probability sufficient to undermine confidence in the outcome. 315 Kan. at 218.

*Levy failed to demonstrate that trial counsel's remarks during opening statement implying Levy would testify or about Levey's state of mind in closing argument amounted to deficient performance.*

Levy claims that trail counsel's opening statement set forth a self-defense theory that was never presented to the jury as well as a promise that Levy would testify. In the opening statement, Levy's trial counsel stated that common sense and the evidence would show the jury what Levy was thinking at the time of the incident—that he was afraid of Summers, afraid for his life, and afraid for the safety of his family. Levy objects to the following language from his trial counsel's opening statement:

6

"Jeremy Levy was afraid. He was afraid for his life. He was afraid of the man in the parking lot, KeAndre Summers. He though[t] KeAndre Summers was going to murder him, so he was in grave fear of that.

"Common sense would tell you, based on the evidence, what he was thinking. It's what any of us would be thinking if a dangerous enemy with designs on hurting us was near our family. Jeremy Levy's family was here at the scene. His mother was there, Ashley Fisher. His grandmother was there, Kay McGill. And Jeremy's little brother Jerrice Fisher was there also. They were all next door. And so his first priority was to not let KeAndre Summers tie Jeremy Levy to Jeremy's loved ones. And so when they left, he didn't leave with them. They left; Jeremy stayed. He finished his haircut, and he thought and he ruminated, ['W]hat am I going to do?[']"

Ultimately, Levy decided not to testify. The district court verified with Levy's counsel that "[y]ou've explained to Mr. Levy that he does have a right to testify and you've gone through all that with him?" Levy's counsel stated that "[w]e have discussed it, Judge" and then Levy confirmed with a "[y]es, sir" that he had in fact discussed testifying with his counsel.

Levy's counsel then made the following statements in closing argument, which Levy alleges drew attention to the "broken promise" from the opening statement that he would testify:

"[TRIAL COUNSEL]: Jeremy Levy is a son, he is a grandson, and he's a big brother. And he has been shot at before and he has been shot before, and he is a survivor. And he is streetwise. He knows about being in the wrong place and being outnumbered. He knows when he is facing overwhelming odds.
"[THE STATE]: I'm going to object. There are no facts to support any of this.
"[THE COURT]: The jury has been instructed to disregard any statements of counsel that are not supported by the evidence.
"[TRIAL COUNSEL]: Thank you, Your Honor. He knows when he has to run for his life. And this is what really happened on this day in June. Jeremy Levy sat in a barber chair on a Saturday evening getting his hair cut by a man who he knew, [J.T.]. Outside he feared for his life that there was a man that wanted to kill him. That was a wrong belief, but that was his fear. Hair cut ended.

7

Jeremy Levy's family had left, . . . his grandmother, his little brother . . . and his mother. . . . They never would have left him there if they had known the risks that he thought he was facing, so he didn't tell them. They left and he stayed behind believing that if he could just get the element of surprise, he could rush out of the barbershop.

"[THE STATE]: Judge, I'm going to object. Mr. Levy did not testify and he can not [*sic*] tell us what he believed or anything else. There's no evidence of it.

"[THE COURT]: The jury has been instructed to disregard any statements of counsel that are not supported by the evidence."

First, these remarks during the opening statement fall well short of a promise that Levy would testify. Some of this evidence could have been presented through other witnesses and could be trial strategy. However, even without deciding whether these statements rise to the level of constitutionally deficient performance in step one of the *Strickland* test, Levy's claim of ineffective assistance of counsel can be overcome because Levy has not met step two to show there is a reasonable probability that this deficient performance affected the outcome of the trial. See *Evans*, 315 Kan. at 218. Levy has not shown that these statements undermine confidence in the outcome of his trial. 315 Kan. at 218.

Evidence presented at trial supported—or created an inference supporting—Levy's counsel's statements. For example, Officer Hemmert testified that Levy had been shot in the arm due to a dispute between gangs that was publicized on television and through social media. The barber cutting Levy's hair just prior to the shooting testified that Levy noticed people outside the barbershop and became agitated. The barber stated that one of the men was Summers with whom Levy did not get along. The barber also testified that he could tell Levy was concerned and that Levy did not want to get a ride home with his mother and grandmother after the haircut "because he didn't want his enemies to know where his mother worked and things like that." Further, the barber explained that he thought Levy was looking for a good time to exit because he left the barbershop quickly. This testimony supports the inference that Levy knew Summers and was afraid of him.

8

Given the ample testimony supporting an inference that Levy knew Summers and was afraid of him and the testimony that Levy had been previously shot in an apparent gang dispute, there is no reasonable probability that any deficiency related to his trial counsel's remarks about Levy's state of mind at the barber shop during opening statements and closing arguments undermines the confidence in the outcome of this trial. Each of trial counsel's statements was supported by the evidence and the Kansas Supreme Court has already found there was sufficient evidence to support Levy's conviction. *Levy*, 313 Kan. at 236.

*Levy failed to demonstrate trial counsel's performance was deficient for failing to present a theory of self-defense.*

At trial, Levy denied acting in self-defense; but also argues in the 60-1507 motion and on appeal that his counsel was ineffective for failing to present a self-defense theory. The district court errs by denying "a K.S.A. 60-1507 motion without a hearing where the motion alleges facts which do not appear in the original record but which, if true, would entitle the movant to relief, and the motion identifies readily available witnesses whose testimony would support such facts or other sources of evidence." *Swenson*, 284 Kan. at 939. Levy argues that his 60-1507 motion includes new information that he possessed a firearm for the purpose of self-protection at the time of the shooting—but still denies using it. In his 60-1507 motion, Levy asserts that:

> "Approximately three weeks prior to petitioner[']s arrest in this case on 5-29-17, he was subjected to an attempted murder of his person by the parties and confederates of those involved in this case and was shot (in the arm), and only [by] the grace of God was his life spared and he was admonished by relatives to purchase a firearm for self-protection (petitioner was legally eligible to purchase and obtain a concealed weapon license, even though he had no desire to and had never even held a firearm prior to being shot), and he was induced by a relative who legally owned firearms to take one of his revolvers for self-protection and legally did so.

9

"On the date of the events central to this case, as the petitioner exited the barbershop, there was a group of individuals he was certain of being those who had attempted to murder him three weeks earlier and petitioner was armed with the revolver legally loaned to him by a relative for self-protection. His wounded arm was in a sling and he was highly distressed to leave the area without being seen, but was noticed by the group who pulled out their firearms and began shooting at petitioner in a mad frenzy, and apparently another person behind petitioner began shooting back at the multiple persons in the hostile group shooting at the petitioner as he hid behind a vehicle.

"Note that the spent shell casings in the vicinity where the petitioner sought cover could only have come from the person behind him who apparently believed he was the group[']s target. A revolver does not expend shells.

"Note also that this area where the shooting occurred has always been a high crime area with multiple shootings and the WPD records of such are extremely relevant."

Levy argues on appeal that these statements of fact constitute new evidence not present in the record and require the district court to conduct a hearing on his 60-1507 motion.

Contrary to Levy's argument on appeal, his 60-1507 factual assertions were not new but were supported by evidence presented at trial. Officer Sage Hemmert testified at trial that Levy was a member of the Folk Gangster Disciples while Summers was a member of the rival Piru Blood gang, and that these gangs had been feuding in Wichita since 2008 when a member of one gang killed a member of the other. He further explained that in January 2017, the feud escalated when the Bloods released a music video about killing a Gangster Disciple. Officer Hemmert then explained that in May 2017, there was a series of back-and-forth shootings between the gangs in which Levy was shot in the arm. Because the local news ran a story on the shooting with a description of the shooter, several Blood gang members then posted on Facebook that Levy was a snitch. Later, on June 17, 2017, Officer Hemmert confirmed he responded to the shooting underlying this case that involved Summers and other Blood gang members and Levy. The barber testified that Levy said he did not get along with Summers and acted reluctant to exit the barbershop and exited quickly when he had the opportunity. This evidence

10

demonstrated, or at the very least created an inference, that the men outside the barbershop—which included Summers—were compatriots of people who had previously attacked Levy. So, that portion of Levy's 60-1507 motion is not new evidence.

Additionally, evidence was presented at trial that Levy had a gun; although, Levy's trial counsel asserted he did not. A witness confirmed that on the day of the shooting, she saw a man running across a field in her neighborhood near the barbershop where the shooting occurred in this case. The witness confirmed that she told the 911 operator and a police officer that the man had a gun. Officer Kyle Perry testified that he interviewed a different witness who saw two men approach each other in the parking lot near the barbershop followed by the noise of gunshots and then later saw those same two men shooting at each other in a field near the barbershop. This creates an inference that Levy had a gun the day of the incident.

The only evidence asserted by Levy that does not appear in the trial record is that Levy's family members convinced him to obtain a firearm and then provided him with a weapon. However, Levy does not explain how any of this information would have entitled him to relief on his claim that trial counsel failed to investigate or present a self-defense theory. See *Swenson*, 284 Kan. at 939. Even if Levy's other statements constituted new evidence—he fails to show how this evidence supports a theory of self-defense that his trial counsel failed to present at trial. It was Levy's "burden to prove his . . . K.S.A. 60-1507 motion warrants an evidentiary hearing" and he was required to "make more than conclusory contentions and must state an evidentiary basis in support of the claims or an evidentiary basis must appear in the record." 284 Kan. at 938.

Levy does not allege that he shot at Summers in self-defense. In fact, Levy claims some other unidentified person behind him shot at Summers. A claim of self-defense necessarily involves an admission to the use of force:

11

"(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force."  K.S.A. 21-5222(a).

Levy did not assert facts supporting a claim of self-defense on appeal, in his 60-1507 motion to the district court, or at trial, thus undermining his claim of error stemming from his trial counsel's failure to assert such a defense.

CONCLUSION

After abandoning almost all of the arguments asserted in his K.S.A. 60-1507 motion by failing to assert them on appeal, Levy failed to support his remaining claims that his trial counsel was ineffective for implying that Levy would testify and failing to present a theory of self-defense. The facts Levy presented as new evidence warranting a hearing on his 60-1507 motion are neither new nor availing, even if true. The motion, files, and records of this case conclusively establish that Levy is not entitled to relief on his claim of ineffective assistance of counsel presented on appeal and the district court did not err in summarily dismissing Levy's 60-1507 motion

Affirmed.