NOT DESIGNATED FOR PUBLICATION

No. 126,390

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

VENANCIO VIGIL,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; JOSEPH L. MCCARVILLE III, judge. Submitted without oral argument . Opinion filed February 7, 2025. Affirmed.

*Shannon S. Crane*, of Hutchinson, and *Wendie C. Miller*, of Kechi, for appellant.

*Thomas R. Stanton*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., HILL and WARNER, JJ.

PER CURIAM:  Venancio Vigil appeals the district court's denial of his K.S.A. 60-1507 motion arguing that his trial attorney provided ineffective assistance of counsel. Because Vigil's trial counsel did not provide ineffective assistance, we affirm the district court's denial of Vigil's K.S.A. 60-1507 motion.

1

## FACTUAL AND PROCEDURAL HISTORY

In May 2017, a jury convicted Vigil of attempted second-degree murder and aggravated battery for stabbing Francisco Gracia.

On direct appeal, Vigil argued his convictions should be reversed because of several improper comments made by the trial judge toward his defense counsel, one during the preliminary hearing and two in front of the jury. Vigil believed these comments denied him a fair trial. While our court generally agreed that the comments made by the district judge in all three incidents were improper, the panel found that the comments did not affect the outcome of the trial. *State v. Vigil*, No. 118,670, 2020 WL 741702, at *1 (Kan. App. 2020) (unpublished opinion). Accordingly, Vigil's convictions were affirmed. 2020 WL 741702, at *9.

Vigil timely moved for relief from his convictions under K.S.A. 60-1507, alleging ineffective assistance of counsel due to reasons unrelated to those raised in his direct appeal. He alleges that his counsel was ineffective in four specific ways:

1. Failure to call Amber Perez to testify at his trial;
2. Failure to introduce evidence that the shoes introduced at trial were not his;
3. Failure to object to an improper lineup; and
4. Failure to object to the crime scene being tainted.

As to the last three claims, the district court sustained the State's motion to dismiss based on its review of the records, without conducting an evidentiary hearing. As to counsel's failure to call Perez, the court denied Vigil's motion after conducting an evidentiary hearing. Vigil timely appeals the court's ruling and facts will be presented as necessary to resolve each claim of error.

2

ANALYSIS

I.       STANDARD OF REVIEW FOR CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL

Claims of ineffective assistance of trial counsel are analyzed under the two-prong test articulated in *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and adopted by the Kansas Supreme Court in *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985). Under the first prong, the defendant must show that defense counsel's performance was deficient. If successful, the court moves to the second prong and determines whether there is a reasonable probability that, absent defense counsel's unprofessional errors, the result would have been different. *State v. Evans*, 315 Kan. 211, 217-18, 506 P.3d 260 (2022).

To establish deficient performance under the first prong, the defendant must show that defense counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential. A fair assessment of counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight, reconstruct the circumstances surrounding the challenged conduct, and evaluate the conduct from counsel's perspective at the time. 315 Kan. at 218. A court considering a claim of ineffective assistance of counsel must strongly presume that defense counsel's conduct fell within the wide range of reasonable professional assistance; that is, the defendant must overcome the strong presumption that, under the circumstances, counsel's action might be considered sound trial strategy. *Khalil-Alsalaami v. State*, 313 Kan. 472, 486, 486 P.3d 1216 (2021).

Under the second prong, the defendant must show that defense counsel's deficient performance was prejudicial. To establish prejudice, the defendant must show with reasonable probability that the deficient performance affected the outcome of the

proceedings, based on the totality of the evidence. A court hearing a claim of ineffective assistance of counsel must consider the totality of the evidence before the judge or jury. 313 Kan. at 486. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Evans*, 315 Kan. at 218.

II.     REVIEW OF THREE CLAIMS DISMISSED BY COURT WITHOUT EVIDENTIARY HEARING

Three of Vigil's claims that his trial counsel was ineffective were dismissed by the district court without an evidentiary hearing. Vigil asks us to reverse the district court and remand these claims for an evidentiary hearing.

When handling a K.S.A. 60-1507 motion, the court may determine that the motion, files, and case records conclusively show the prisoner is entitled to no relief and summarily deny the motion. For those claims, we conduct a de novo review to determine whether the motion, files, and records of the case conclusively establish that the movant is not entitled to relief. *State v. Vasquez*, 315 Kan. 729, 731, 510 P.3d 704 (2022).

Vigil bears the burden of establishing entitlement to an evidentiary hearing. To meet this burden, his contentions must be more than conclusory, and he must either set forth an evidentiary basis to support those contentions or the basis must be evident from the record. See *Thuko v. State*, 310 Kan. 74, 80, 444 P.3d 927 (2019).

We will examine each of the three summarily dismissed claims under this standard. The pertinent facts related to these claims were established at trial.

A. *The facts related to Vigil's three claims of ineffectiveness of trial counsel.*

On August 31, 2016, Vigil and two friends, Tony Berends and Matthew Currie, stopped by Francisco Gracia's mother's house to visit Gracia. Gracia testified that one of Vigil's friends handed Vigil a knife and—without saying a word—Vigil stabbed Gracia in the abdomen. Gracia testified that Vigil then chased him into the living room and locked the front door. Gracia testified that, now that they were in the living room, Vigil tried to stab him several more times. Gracia escaped by jumping through a glass window. Gracia then ran, walked, or crawled to a neighbor's house, bleeding while holding his intestines. He knocked on the door of the neighbor's house.

Gracia testified that he saw Vigil's vehicle park in front of the neighbor's house and Vigil got out with the knife. But once Gracia started banging on the window, Vigil got back in his vehicle. The neighbor answered the door, saw Gracia bleeding, closed the door, and called 911. Gracia testified that he walked back to his mother's house and collapsed in the front yard. Amber Perez was a customer at The Smoke Shop across the street. She saw the truck pull up to the house, the driver went inside, a passenger stayed in the truck, and then three people went into the house. As she started to pull away from the Smoke Shop, she heard glass break. She saw the passenger with a large knife. Realizing someone was hurt, she stopped and helped Gracia.

Very shortly thereafter, police found Vigil at his sister's house and arrested him. Police took off Vigil's size 8 shoes and placed them into evidence because they found blood on them. That blood was later matched to Gracia.

Roughly an hour after Perez aided Gracia at the scene, police took her to the Reno County Courthouse to identify the stabber. She testified that Detective Bryan Rodriguez listened to her story and when they were getting ready to leave "somebody said that they had the person that they thought maybe did it or whatever in there." Officers asked Perez

5

to view a big screen TV, which showed Vigil sitting at a table. The officers asked Vigil to stand up and move around so that Perez could see him from different angles. Perez told the officers that the man did not look at all like the same person that she saw at the house. She described the person she saw as having a different hair style, clothes, and skin color.

Perez' statement that the person she saw on the screen was not the same person she saw at the house was not disclosed by the prosecution to Vigil's attorney. Vigil's attorney discovered it through a pretrial investigative meeting with Perez. As a result, trial counsel moved the court to either order the prosecution to turn over its discovery related to this matter or to dismiss the charges. The prosecution turned the information over after the motion was filed. The trial was conducted about six weeks later.

At a hearing on the motion, the district court found that the State's actions violated his due process rights under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by not turning over exculpatory information. The court noted that if this information had come out after the trial, it would require a reversal. The court added that it was clearly an illegal lineup. The district court noted that the defense found out the information before trial, suggesting that there was time to remedy the State's violation. But the district judge expressed apparent annoyance that, in his 16 years of experience on the bench, the court noticed a pattern of the State turning over recently found police reports during the middle of trial.

> B. *Failing to argue that the shoes removed from his feet at the time of his arrest were not his shoes.*

Vigil notes that the State introduced shoes with Gracia's blood on them at trial. He argues that his trial counsel was ineffective for not introducing evidence that these shoes did not belong to him and were too big for him.

6

Vigil fails to designate a sufficient record to support his claim. In his original K.S.A. 60-1507 motion, he asserts that the shoes introduced at trial were a size 10, but he wears a size 7 shoe. He makes an unsupported statement that he owns Saucony shoes, and the ones seized were a cheap knockoff. Nowhere in his briefing does he provide a record citation to show that the State presented the jury with a size 10 shoe or that he wears a size 7 shoe. And the record contradicts Vigil's claim.

That is, the lead detective in the case testified that the day of the stabbing, he went into the interview room to speak with Vigil and seized the shoes that Vigil was wearing when he was arrested. He showed them to the jury, marked as State's Exhibit 7, and testified that they were size 8 men's shoes. Vigil provides no citation which would counter this testimony, such as a second pair of shoes at issue or some testimony correcting the shoe size. From the record, the State presented the jury with evidence that Vigil was wearing size 8 shoes when he was arrested, not size 10 shoes.

The district court denied Vigil's motion, finding that whether the shoes belonged to him or whether they fit properly was immaterial. The evidence showed that Vigil was wearing them at the time of the stabbing and at the time of his arrest, even if they belonged to someone else and did not fit properly.

Even if it was a conscious choice by trial counsel not to present such a defense, it did not fall below an objective standard of reasonableness. Because we find that the files, and records of the case conclusively establish that trial counsel's performance was not deficient, summary dismissal of this claim was appropriate.

Moreover, as to the second prong—prejudice—the jury's verdict would have been the same even if trial counsel showed that the shoes belonged to someone else and were too big for Vigil's size 7 feet—whether they were size 8 or size 10. The jury heard

7

evidence that Vigil was wearing them immediately after the stabbing and that police took them off his feet when he was arrested.

C. *Failure to suppress the improper lineup.*

Assuming that the lineup in this case was improper, as the district court held it was, Vigil's claim here is somewhat confusing. Vigil's initial complaint in his pro se motion was that the lineup was illegal, violated his constitutional rights, and "nothing was done." But the State did not seek to introduce the lineup at trial. Vigil cannot fault his trial counsel for failing to act. No action was possible because the State presented no evidence that trial counsel could move to suppress.

And contrary to Vigil's assertion, right after learning that the State withheld potentially exculpatory evidence, defense counsel moved to entirely dismiss the State's case against Vigil. As the State conceded at the motion hearing, dismissal is the most serious sanction against the State for a *Brady* violation. Defense counsel did not fail to address the *Brady* violation or, in Vigil's words, "nothing was done." Quite the opposite. Defense counsel put on evidence and argued vigorously for the district court to sanction the State for its violation.

And we find no obvious error from the district court's ultimate denial of a motion to dismiss the charges. The district court had the unique opportunity of catching the *Brady* violation before prejudice occurred since the trial had not begun, let alone the jury rendered its verdict. The district court recognized this dynamic when it stated that "there would have been an immediate reversal" if the revelation came out after the jury convicted Vigil. So the question before the district court at the pretrial hearing was not whether prejudice occurred, but whether prejudice could be avoided.

The appropriate remedy when a defendant suffers prejudice from a *Brady* violation is for the district court to grant a new trial. See, e.g., *State v. Soto*, No. 125,291, 2023 WL 2822147 (Kan. App. 2023) (unpublished opinion). The district court recognized that Vigil could have suffered prejudice if the State's violation had not been discovered until after trial. But the district court could not grant a new trial when trial had not happened yet. In fashioning an ounce of prevention, the district court certainly threatened the State with a pound of cure: "I can assure you that I will not find it to be inadvertence or neglect if anything else mysteriously appears in this case prior to trial or at trial." The district court made clear its readiness to grant a mistrial or new trial at the slightest provocation.

Counsel subpoenaed Perez to testify at trial about her inability to identify Vigil. Because we find that the files and records of the case conclusively establish that trial counsel's performance was not deficient as it relates to the *Brady* violation, summary dismissal of this claim was appropriate.

D. *Failure to suppress or object to the crime scene photos*

Vigil argues that the crime scene photos show that police tainted the crime scene and that his trial counsel was ineffective for not moving to suppress the crime scene photos or objecting to the evidence.

Vigil asserts that police tampered with evidence and that the crime scene was staged. The district court found that the jury had the opportunity to consider this possibility because the evidence at trial showed inconsistencies in crime scene photos. The district court concluded that trial counsel could not be ineffective for failing to raise an issue when the issue in fact was raised at trial. And the district court found that Vigil could not show that he suffered prejudice because any additional challenge to the crime scene evidence would not have changed the jury's verdict.

9

Substantial competent evidence supports the district court's findings. Defense counsel cross-examined the detective who photographed the crime scene. The detective testified that there was blood on the wall and the door, but did not see an outline of a knife in blood on the floor. Vigil points to this testimony as contradicting Gracia's statement that the knife fell on the floor and he stepped on it. The detective could not remember seeing a knife on the table when he took the photographs, but one photo showed what looked like a knife on the table.

Trial counsel also cross-examined the detective about a chair which was in different locations in different photos, showing that someone moved the chair. The detective explained that he took some of the 296 photos before—and some after—other officers executed a search warrant on the house. Several items were moved, showing up in different locations in different pictures, such as two red balls, a phone book, a water bottle, and, apparently, a Styrofoam cup.

Vigil also describes a black case containing drug paraphernalia. The jury had sufficient evidence to consider its relationship to the case and how it impacted the crime scene. One of the detectives in the case testified to speaking with Gracia's mother about the drug paraphernalia. He explained that he did not want to charge her with possession of drug paraphernalia and told her instead to just "get rid of it." He explained his decision as follows:

> "I did tell her I did find some drug paraphernalia in your house, you need to get rid of it. Yeah, I guess I should have collected it, but, you know, she was going through an emotional thing. Her son just got stabbed. She don't know if he's going to make it or not. So it would have been extremely even hard for us to determine whose drug paraphernalia it belonged to. So I took it upon myself and I guess, yeah, I was wrong but I took it upon myself just to tell her to get rid of it."

The jury had the opportunity to consider which evidence was moved or removed from the scene. The jury was able to evaluate whether and how evidence was tampered with and what weight to give the crime scene evidence. Trial counsel cross-examined police officers about inconsistencies in the evidence. Vigil presented his theory that evidence was removed from the crime scene, or even that the crime scene was staged. But the jury had the chance to evaluate this theory, and Vigil fails to show that his trial counsel was deficient in this respect.

Vigil fails to show that trial counsel's actions would have affected the outcome. Even if trial counsel successfully moved to suppress photographs which were inconsistent, the jury's verdict would have been the same. Gracia testified that the stab wound causing him to get 68 staples in his abdomen came from his cousin, Vigil. And when police arrested Vigil that day, Vigil was wearing shoes with Gracia's blood on them. Suppression of photos which showed inconsistent placement of a phone book, a chair, some balls, and a water bottle would not have changed the jury's verdict. Thus, Vigil fails to show that his trial counsel's performance was deficient, and moreover, he fails to show that even if it was, he was prejudiced by her performance. Accordingly, we affirm the district court's denial of Vigil's K.S.A. 60-1507 motion on this ground.

III.    VIGIL'S REMAINING CLAIM WAS DENIED AFTER AN EVIDENTIARY HEARING

Vigil argues that his trial counsel was ineffective because she did not call Perez to testify about her failure to identify him as the person she saw at the house that day.

In reviewing a district court's decision on claims of ineffective assistance of counsel following an evidentiary hearing, appellate courts review the district court's factual findings using the substantial competent evidence standard. Appellate courts review the district court's legal conclusions based on those facts applying a de novo standard of review. *Evans*, 315 Kan. at 218.

11

Vigil argues that his trial counsel was ineffective because she did not call Perez to testify about her failure to identify him as the person she saw at the house that day.

Some aspects of a criminal case remain with the accused, such as what plea to enter, whether to waive a jury trial, or whether to testify. But other aspects of a criminal case—such as what witnesses to call, whether and how to conduct cross-examination, and other strategic and tactical decisions—are left to defense counsel after consultation with his or her client. *State v. Peters*, 319 Kan. 492, 499, 555 P.3d 1134 (2024) (citing *Edgar v. State*, 294 Kan. 828, 838, 283 P.3d 152 [2012]). Strategic choices made by counsel after a thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. Strategic choices made after an incomplete investigation can fall within the wide range of reasonable professional assistance if the decision to limit the investigation is supported by reasonable professional judgment. *State v. Hutto*, 313 Kan. 741, 750, 490 P.3d 43 (2021).

The district court held an evidentiary hearing on Vigil's K.S.A. 60-1507 motion specifically to receive evidence on why defense counsel never called Perez during trial. At the evidentiary hearing, Vigil's K.S.A. 60-1507 counsel questioned his trial counsel as follows:

"Q. Is it fair to say that you had [Perez] subpoenaed because you believed she might have evidence that would be beneficial to Mr. Vigil?

"A. It was. If I can cut to the chase?

"Q. I'm not sure what you mean by that.

"A. She was sitting in the lobby outside of courtroom, too, when they brought Mr. Vigil in for court and Miss Perez looked at him and said oh, maybe it was him at which point [co-counsel] and I said thank you, you are excused.

"Q. And that is why you chose not to call her?

"A. Correct."

Vigil's trial counsel's performance was not deficient. The decision to call witnesses and how to examine and cross-examine them is part of the attorney's responsibility. *Peters*, 319 Kan. at 499. Such choices are virtually unchallengeable if counsel does a thorough investigation of facts, law, or both, as applicable. Here, counsel's investigation of the facts was brief, but it was as brief as it needed to be. Counsel learned that the witness she hoped would help exculpate Vigil might in fact incriminate him. The decision to dismiss a witness who might help the State's case was a reasonable choice.

Second, even if no reasonable attorney would have turned Perez away, Vigil fails to show that the decision prejudiced him. On this point, it is important to view Perez' proffered testimony in light of the evidence at trial as a whole. Defense counsel called Perez to testify at a pretrial hearing, when asking the district court to sanction the State's failure to turn over exculpatory evidence. Perez described what she witnessed as follows:

"Q. And did you see something happen from The Smoke Shop?

"A. Yeah, I was sitting there and there was a, like this little TrailBlazer pulled up in the alley and I remember I was sitting there and the guy in the passenger seat—the driver got out. The guy in the passenger seat he sat there and he was just looking at me. My daughter was, like, mom, let's go, because that guy is just staring and I didn't know. So I just said let's just get a drink and go.

"Q. So what did you see?

"A. I didn't see much of anything. I just saw the driver went inside, the driver came outside, two other guys got out of the truck, all three persons entered the house and at that time I, I was just getting ready to pull—and then at that time I heard glass break and so I pulled away 'cause I didn't know if it was a shot or, you know, I didn't know what I heard but I can tell you that I know that the driver, the person that was in the passenger seat, I seen him have a big black knife. It was long. I never seen nothing in the driver's hand. I never, I only seen something in the passenger. He's the one that had the weapon. Anyway, I heard the glass break and I knew I had to get out of there because my kids were in the car and I didn't know if they had a gun."

13

The first remarkable fact from Perez' testimony is that she and her daughter seemed to make eye contact with, or at least pay more attention to, the passenger. The second thing which is remarkable about Perez' testimony is her confusion between the driver and passenger when she says, "'I know that the driver, the person that was in the passenger seat, I seen him have a big black knife.'" It is unclear from this statement whether she intended to describe the driver or the passenger, likely prompting her correction that she never saw anything in the driver's hand, only the passenger's.

Perez' later testimony seems similarly contradictory in terms of describing the driver or passenger. She went on to describe how she answered police questions as follows:

> "Q. And at some point did they ask you if you could identify the person who was holding the knife? Is this the person they asked you to identify?
> "A. Not, not the person that was holding the knife. At that time I think he was the only person that they had.
> "Q. So did they ask you if you knew any of them?
> "A. Yeah, if I knew any of them.
> "Q. Did you know any of them?
> "A. No. When I looked at the camera I can't a hundred percent say that that was that person. Now, if—I could see the driver had a tattoo here, the younger kid had curly long hair. Like, I know them two 'cause I saw them right there, you know, but the driver I can't."

This part of her testimony is difficult to construe. She definitively stated that she could identify "'the younger kid'" because of his curly hair. But her statements about the driver are internally contradictory. On the one hand, she says she could identify the driver by his tattoo. On the other hand, she states that she cannot identify the driver. This testimony only makes sense in light of her earlier contradiction where she confused the driver and passenger. Her testimony is easily reconcilable under the assumption that she

14

again said one when she meant the other. That is, Perez meant to say that she could identify the driver by his tattoo, but not the passenger—or vice versa—that she could identify the passenger by his tattoo, but not the driver. Her earlier testimony was that the passenger was staring at her and her daughter, making it more likely that she got a better look at the passenger and could recognize the passenger's tattoos. Vigil notes that he does not have a tattoo above his eye, arguing that Perez' testimony was vital on this point. But Perez ambiguously stated that one man had a tattoo while implying that the other did not.

Vigil, Berends, and Currie were together that day. Perez attempted to describe three men in her testimony. She describes a younger kid with curly hair, a man with tattoos, and another man who she could not clearly identify. When she tried to compare Vigil to these men, she told police that his clothes and hair were different from any of the men she saw but she could "[a]bsolutely not" be positive in her identification.

The value of Perez' testimony further declined when she arrived to testify and told defense counsel that Vigil might be the man she saw. Against this, it is necessary to compare the testimony that the State was prepared to put on. Gracia testified that Vigil stabbed him in the abdomen from the front, meaning Gracia was face-to-face with his attacker. Gracia testified that Vigil explained that he was stabbing him as retribution from the Texas Syndicate. And Gracia testified that their fathers were cousins. Perez' ambiguous statements—that the stranger she saw from across the street at The Smoke Shop might not have been Vigil—would not have affected the jury's verdict. Trial counsel's decision not to call Perez to testify was objectively reasonable but, even if it were not, Vigil could not show prejudice. Because Vigil fails to show that his trial counsel's performance was deficient, we affirm the district court's denial of Vigil's K.S.A. 60-1507 motion.

Affirmed.

15