NOT DESIGNATED FOR PUBLICATION

No. 129,291

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JAMES A. VAUGHAN JR.,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Submitted without oral argument. Opinion filed June 26, 2026. Affirmed.

*Joseph A. Desch*, of Law Office of Joseph A. Desch, of Topeka, for appellant.

*David Greenwald*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before CLINE, P.J., BOLTON FLEMING, J., and JEFFREY GETTLER, District Judge, assigned.

CLINE, J.: James A. Vaughan Jr. appeals the district court's denial of his K.S.A. 60-1507 motion, which challenged the effectiveness of his trial counsel. On review, we find that Vaughan has not met his burden to show his counsel was ineffective or, even if she was, that her alleged deficient performance prejudiced him. We therefore affirm the district court's decision.

1

A jury convicted Vaughan of aggravated robbery and kidnapping stemming from crimes that occurred in 2014. We affirmed Vaughan's convictions in 2017. *State v. Vaughan*, No. 113,665, 2017 WL 4082357, at *1 (Kan. App. 2017) (unpublished opinion) *rev. denied* 308 Kan. 1601 (2018).

The underlying facts were described in Vaughan's direct appeal:

"Vaughan entered Advantage America, a cash advance/payday loan business in Wyandotte County, Kansas, to inquire about getting a title loan. The assistant manager, Heather Alexander, was working alone that day. While assisting another customer, she greeted Vaughan and informed him that they did not provide title loans; she gave him the name of another business down the road that might assist him, and Vaughan left.

"Approximately 15 minutes prior to closing, Vaughan returned to Advantage America where Alexander was now alone. Vaughan inquired about a payday loan or other cash advance but, since it was so late in the day, Alexander told him she would not be able to process the loan until Monday when she could verify his account with his bank. She did not immediately recognize Vaughan as the same man from the morning because he was wearing different clothes. Over the next 15 minutes, Vaughan engaged Alexander in conversation about the other types of services Advantage America offered. Vaughan suggested it was probably close to closing time and speculated that Alexander was probably ready to go home for the day. Alexander looked down at her computer to check the time and when she looked up, Vaughan had put on his sunglasses and was pointing a black handgun with a 5 to 7 inch barrel at her face and chest. He was also wearing a ball cap and a dust mask on top of his hat, but he did not pull the mask down to cover his face. While pointing the gun at Alexander, Vaughan stated, 'I'm sorry. I don't wanna do this.'

"Alexander put her hands up 'as an instinct.' She testified, 'I was scared for my life. I've never had a gun pointed at my face before.' Vaughan told her not to push any alarms, to lock the front door, and to flip the closed sign on the door; Alexander did as she was told. He told her he knew there was a safe in back behind the partition and that

she had the combination; he told her to take him to the safe. She testified that she did what he told her to do because '[t]here was a gun pointed at me and he told me to.'

"Vaughan was behind Alexander as they walked from the front of the shop to behind the partition. There were no security cameras behind the partition. The safe was in a lower cabinet, so Alexander opened the cabinet, entered the code, opened the safe, and stepped back to allow Vaughan to access the contents. Alexander was approximately 2 to 3 feet behind and to the side of Vaughan; as he went through the safe, he would look back and forth from the safe to her and ask questions such as: 'Is this all the money that's in there?' and 'Is there anything else?' As Vaughan checked another deposit bag in the safe, he asked if that was all the money there was; she replied that was all of the money as it had been a slow Saturday.

"There was not an opportunity for Alexander to leave because there was never a very long period when his back was to her; he was 'within touching distance of me'; she did not feel free to go or move further away; and she did not try to flee out the back door because 'I was scared. I wasn't going to make the situation any worse.' There was never a point when she did not feel in danger. Alexander believed Vaughan still had the gun out and within reach while he was looking through the safe. Alexander asked Vaughan to 'please just don't hurt' her, to which he replied that if she gave him the money, he would not hurt her. He took the currency from the safe but left the bags.

"After emptying the safe of the currency, Vaughan asked if there was a bathroom and told Alexander to go inside it. Alexander testified that she was unsure why he wanted her to go into the bathroom, 'I didn't know what was going to happen . . . . I wasn't sure why he needed me to go to the bathroom.' Before the door closed, Vaughan asked her how to access the money in the front cash drawer and she told him; he then told her to count to 60, and he said, '[I]f I exited the bathroom before I count to sixty, that [he] or his partner . . . would shoot me.' Alexander feared for her safety while she was in the bathroom because of Vaughan's threat to shoot her if she came out too soon. Alexander was in the bathroom when Vaughan took the money out of the front cash drawer.

"While in the bathroom, Alexander counted to at least 60 because she started over several times out of fear she was counting too fast. When she thought she had waited long enough, she slowly opened the bathroom door, yelled to see if anyone was there, and then slowly walked out, looking under counters. Once she believed she was alone, she immediately went to the front of the store, locked the door, pressed the panic

button, and called 911. According to video footage, it was approximately 3:08 p.m. when she came out of the bathroom.

"Vaughan took over $1,100 from the safe and over $200 from the front drawer, for a total of approximately $1,378. There were two security cameras in the front of the shop, and the police took the recorded footage from the robbery. There is no dispute that the gun used, later recovered by police, was actually a Crossman air gun or pellet gun. Police did not attempt to test-fire it. It was only upon close examination that it was identified as such, because the gun looked like a Smith & Wesson 9–mm handgun.

"Vaughan's defense consisted exclusively of his testimony. He testified at trial that he needed money to cover drug and gambling debts, and he planned to get a 'bad check' loan from the shop. He tried, unsuccessfully, other avenues to generate funds, such as credit card applications. He admitted that it was him on the video footage from 10:30 that morning, and testified that he was not successful at getting the title loan at the location Alexander sent him to that morning. Vaughan testified that between his visits to Advantage America that day, he also went to the library to email people about getting some money. He had an evolving plan for acquiring the money he needed: a title loan, credit cards, a check loan, or a 'snatch and grab,' and then pulling the gun. He claimed he did not specifically target Advantage America but 'I knew [at] some point in that day I was going to get money. I knew I was going to steal some money. I knew that.' He testified that the reason he grabbed the BB gun was because he intended to show it during his escape to scare people away from attempting to stop him.

"When he went back to Advantage America at 2:45 p.m., he planned to either get a loan or to do a 'snatch and grab' of the money in the drawer. He knew the shop closed at 3 p.m. on Saturdays. Vaughan admitted that he bought the dust mask at a pharmacy between his visits to Advantage America and the purpose of the mask during his second visit was to hide his face, but he forgot to pull it down. He asked his niece to bring him his bag with a change of clothes. The bag also contained the BB gun. He changed clothes in a parking lot between his visits to Advantage America. He testified, 'I knew I was going to more than likely pull the BB pistol . . . so I could get the money . . . .' Vaughan testified that he was not going to hurt Alexander, '[A]ll I wanted to do was steal the money.'

"Vaughan testified that the BB gun he used that day was not functional because he had rendered it inoperable. He admitted that he concealed the gun in the waist of his pants and wore a baggy shirt so people would not see it, '[S]o when I pulled it out I was

4

intending to show her, to scare her so I could just steal the money.' He testified that he was sorry he was planning to scare her. He claimed that Alexander 'took over' after he pointed the gun at her, and he credited her job training. Vaughan testified that while walking back to the safe, he put the gun back in his pants so Alexander would not be so scared. He said that he told her that he had a friend outside and not to follow him because the friend wouldn't like it, and he testified, 'I don't remember if I ever told her I was going to shoot her.' He said that the reason he took the BB gun in the store was because he knew it was incapable of firing.

"Once he was in the safe, Vaughan testified that Alexander asked him what he wanted her to do next, '[Y]ou could see she was still—I mean, anybody would be scared still, even though we talked about things, I thought she was still scared.' Vaughan claimed that he suggested she go into the bathroom and count to 60 and not follow him and that is when she said, '[P]lease don't hurt me.' Vaughan testified that Alexander went into the bathroom and that is when he took the money from the safe and the front drawer. He also attempted to find the video footage before he left.

"Vaughan was convicted as charged with one count of aggravated robbery for unlawfully and knowingly taking property from the presence of another by threat of bodily harm while armed with a dangerous weapon and one count of kidnapping for unlawfully taking or confining a person by threat with the intent to hold such person to facilitate flight or the commission of a crime. K.S.A. 2013 Supp. 21-5420(b)(1), (c)(2); K.S.A. 2013 Supp. 21-5408(a)(2), (c)(1). He was sentenced to a controlling prison sentence of 233 months." 2017 WL 4082357, at *1-3.

Vaughan alleged over 50 constitutional errors in his K.S.A. 60-1507 motion. The district court ordered an evidentiary hearing on some of Vaughan's claims but dismissed the rest. Both Vaughan and his trial counsel testified at that hearing. After the hearing, the court issued a journal entry, denying Vaughan's motion. Vaughan appeals this decision.

5

On appeal, Vaughan only challenges the district court's decision on two of his claims, both of which involve whether his trial counsel provided ineffective assistance.

First, Vaughan claims his counsel should have called another witness at a hearing before trial to suppress Vaughan's videotaped statement to police. Second, he claims his counsel called him "to testify at trial without a full consultation on his right not to testify."

Vaughan contends the district court erred in denying his K.S.A. 60-1507 motion because his counsel's deficient representation set off a "chain reaction" that left him "scrambling to explain his recorded statement at trial." He claims her performance prejudiced his trial outcome because he testified "poorly" and "to his own significant detriment."

*Standard of Review and Relevant Legal Framework*

Because the district court held a full evidentiary hearing on the claims Vaughan raises on appeal, we review the court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. *State v. Evans*, 315 Kan. 211, 218, 506 P.3d 260 (2022). Substantial competent evidence refers to legal and relevant evidence that a reasonable person could find adequately supports a conclusion. *Granados v. Wilson*, 317 Kan. 34, 41, 523 P.3d 501 (2023). And in reviewing whether there was substantial competent evidence, this court cannot weigh conflicting evidence, evaluate the credibility of witnesses, or otherwise redetermine questions of fact. *White v. State*, 308 Kan. 491, 504, 421 P.3d 718 (2018). Appellate review of the district court's conclusions of law is de novo. *Khalil-Alsalaami v. State*, 313 Kan. 472, 486, 486 P.3d 1216 (2021).

A court presented with an ineffective assistance of counsel claim must consider the totality of the evidence before the judge or jury. These claims are analyzed under the two prong test articulated in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and adopted by the Kansas Supreme Court in *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985). 313 Kan. at 485-86. Under the first prong, the defendant must show their counsel's performance was deficient. To establish deficient performance, Vaughan must show that his trial counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance in an ineffective assistance of counsel claim is highly deferential. A fair assessment of counsel's performance requires that every effort be made to "'eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Evans*, 315 Kan. at 218. A court considering a claim of ineffective assistance of counsel must strongly presume that defense counsel's conduct fell "'within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, [counsel's] action "might be considered sound trial strategy."'" *Khalil-Alsalaami*, 313 Kan. at 486.

Under the second prong, Vaughan must show with reasonable probability that his trial counsel's deficient performance caused him prejudice. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Evans*, 315 Kan. at 218. In other words, he must show his trial counsel's conduct affected the outcome of the proceedings. Regardless of the inadequacy of legal representation, a K.S.A. 60-1507 motion fails if the movant cannot establish substantial prejudice. See *Edgar v. State*, 294 Kan. 828, 843-44, 283 P.3d 152 (2012).

*Vaughan has not shown ineffective assistance nor prejudice from his counsel's failure to call a witness during a suppression hearing.*

Before trial, Vaughan moved to suppress the videotaped statement he gave to two law enforcement officers, Detective Victoria Fogarty and Sergeant Ed Kennedy. At the suppression hearing, Vaughan testified that Fogarty threatened to arrest his wife for aiding and abetting and Kennedy threatened to arrest his friend and two other people if Vaughan did not give a statement. Vaughan claimed he felt coerced by these threats. He also said Fogarty told him no one would be arrested if he provided a statement. But when Fogarty was asked if she threatened Vaughan or threatened to arrest his wife or friend during the interview, she denied this occurred. Kennedy did not testify at the hearing. In the end, the district court did not find Vaughan's statements that he was coerced into giving a confession credible and denied his motion to suppress.

In his K.S.A. 60-1507 motion, Vaughan alleged his counsel was ineffective for failing to call Sergeant Kennedy to testify at the suppression hearing. Vaughan testified at the hearing on his 1507 motion that he asked his counsel to call Kennedy to testify at the suppression hearing so she could question Kennedy about whether he made threatening or coercive statements to Vaughan before the recording began. When asked about her decision not to call Kennedy, Vaughan's counsel said she did not believe Kennedy would have said anything helpful to Vaughan's defense. Counsel pointed out that she called the lead detective (Fogarty) who was present during Vaughan's interview and confession. Counsel said she questioned Fogarty about Vaughan's claims and that counsel told Vaughan she did not expect an admission from Detective Fogarty to threatening or coercing him.

On appeal, Vaughan argues that if his counsel had called Sergeant Kennedy to testify, and Kennedy's testimony "was even partially consistent with Vaughan's version of events, the suppression would have been granted with the statement being involuntary

8

and in violation of *Miranda* [*v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)]." There are several problems with Vaughan's claim.

First, as the State points out, Vaughan offers nothing but "speculation and conjecture" to support his argument. He provides no evidence that Sergeant Kennedy would have contradicted Detective Fogarty's testimony or admitted that he threatened or coerced Vaughan.

Next, Vaughan's counsel explained her decision-making process in deciding not to call Sergeant Kennedy, and courts generally defer to trial counsel on such strategic decisions. See *Bledsoe v. State*, 283 Kan. 81, 92, 150 P.3d 868 (2007) ("The decisions on what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his or her client."). Her explanation was reasonable, and Vaughan fails to carry his burden to prove otherwise.

Additionally, even assuming Vaughan established his counsel was ineffective, he also does not meet his burden to show a reasonable probability of a different outcome at trial but for his counsel's alleged deficient performance. As the State points out, even setting aside Vaughan's videotaped confession, Vaughan was captured on video committing the crimes, and he did not wear a mask when he put a gun to the victim's face. The victim also testified at trial and identified Vaughan as the perpetrator. Based on this record, we fail to see how Vaughan's trial outcome would have changed even if his counsel had been able to successfully suppress his recorded confession.

*Vaughan has not shown ineffective assistance nor prejudice regarding his trial testimony.*

Vaughan also claimed in his K.S.A. 60-1507 motion that his trial counsel was ineffective when representing him because he alleges she told him after the State rested its case at trial that he "needed to testify or he might lose." He claimed she told him he needed to "tell his side . . . to convince the jury that he only intended to steal (commit theft)," "[t]o describe what happened behind the [partitions] at Advanced America," and "[t]o basically admit that it was he on the video." At the hearing on his 1507 motion, he elaborated by alleging his counsel told him if he testified, they could avoid a kidnapping conviction. He said she told him if they could convince the jury that Vaughan did not have a gun when he and the victim were behind the partition, it would be possible to only get a "regular robbery conviction, but the kidnapping conviction won't be able to go."

Vaughan admits his counsel's testimony at the 1507 hearing conflicted with his. But he claims her testimony does not provide substantial competent evidence to support the district court's denial of his motion because he characterizes it as "equivocal" and "generic." That is, he says his counsel did not directly say she did not tell Vaughan to testify but, instead, she testified about how she generally advises clients on testifying. He contends that even if it was his decision to testify, "he was not fully advised" about that decision.

We find Vaughan's view of the record to be strained and disagree with his statement that "there is no particular indication in this record that trial counsel fully advised Vaughan of his right to not testify." At the evidentiary hearing, Vaughan's counsel was asked directly about Vaughan's version of events, which she denied:

"Q. Do you remember having conversations with him leading up to the trial, during the trial, even before testifying, about the pros and cons of him testifying?
"A. Absolutely.

10

"Q. And did you tell him he absolutely had to testify?

"A. No. I never tell anybody that.

"Q. Do you give them advice, based upon your experience, what you think might be best for him?

"A. Yes.

"Q. Did you do that in this case?

"A. Yes.

"Q. Do you remember if you advised him to testify?

"A. Well, so I probably—I shouldn't say probably. I would have told and I told Mr. Vaugh[a]n that it probably was not a good idea for him to testify. Number 1, because Mr. Vaugh[a]n, despite the fact of his—his belief in himself that he's highly intelligent, I think would suffer what a lot of witnesses suffer on the stand, lay witnesses, as it were. He's not used to testifying, he had not testified in a trial before, he'd already given an admission against interest when he was interviewed by law enforcement, he'd already testified at a pretrial motions hearing, there would have been so many things that I would have told him would have been working against him if he took the stand.

"Q. So just so we're clear, did you go into a hallway and tell him he absolutely had to get on the stand?

"A. No.

"Q. Or that he might lose?

"A. No.

"Q. And so do you specifically remember advising him that he probably should not testify?

"A. In this case that would have been what I told him, yes."

When counsel was asked about her process when going over testifying at trial, she said:

"Again, as part of what I've established in working on cases, we always talk about a person's right to testify. I explain to them that's their constitutional choice, that I can advise them what to do or not do based upon the individual aspects of their case.

11

"I let them know that they really don't have to come to a final decision about testifying until we would start our case in chief, that they can take in all the information that we've worked on preparing for trial, all the information that they can gather as part of pretrial motions, all the information that they can gather as part of trial, before they would make that decision, and that's the process I went through with Mr. Vaugh[a]n."

Additionally, counsel said she did not give an opening statement because Vaughan was "in the process of debating with himself about whether or not he was going to testify, so not knowing exactly what Mr. Vaugh[a]n would say or if he would even say anything if he would take the stand, I thought it prudent strategically not to give an opening." We find this testimony provides substantial competent evidence supporting the district court's decision to deny Vaughan's claim.

That said, we also find Vaughan has failed to establish that he was prejudiced even assuming his counsel's representation was deficient. He offers no explanation for why the outcome of the trial would have been different—instead, he simply states that "he was not fully advised and improvidently chose to testify to his detriment." But, as mentioned, his damaging testimony was not the only evidence that supported his conviction. The jury was also presented with video of the crime, an eyewitness identifying Vaughan as the person who put a gun in her face, and his taped confession.

Therefore, we find the district court did not err in denying Vaughan's K.S.A. 60-1507 motion.

Affirmed.

12